961 A.2d 29 (2008)
404 N.J. Super. 241
POLAROME INTERNATIONAL, INC., formerly known as Polarome Manufacturing Co., Inc., Plaintiff-Appellant,
v.
GREENWICH INSURANCE COMPANY and Zurich Insurance Company, Defendants-Respondents.
DOCKET NO. A-0566-07T1
Superior Court of New Jersey, Appellate Division.
Argued September 10, 2008.
Decided December 17, 2008.
*33 Lynda A. Bennett argued the cause for appellant (Robertson, Freilich, Bruno & Cohen, Newark, attorneys; John Agar and Ms. Bennett, on the brief).
Charles J. Stoia, Morristown, argued the cause for respondent Greenwich Insurance Company (Porzio, Bromberg & Newman, attorneys; Mr. Stoia, of counsel; Mr. Stoia and Laura C. Conway, on the brief).
Robert W. Muilenburg, Morristown, argued the cause for respondent Zurich American Insurance Company (Coughlin Duffy, attorneys; Mr. Muilenburg, of counsel; Mr. Muilenburg and Conor T. Mulcahy, on the brief).
Before Judges FISHER, C.L. MINIMAN and BAXTER.
The opinion of the court was delivered by
C.L. MINIMAN, J.A.D.
Plaintiff Polarome International, Inc., formerly known as Polarome Manufacturing Co., Inc. (Polarome), appeals from a declaratory judgment dismissing its complaint on the ground that neither defendant Greenwich Insurance Company (Greenwich) nor defendant Zurich Insurance Company (Zurich) owes Polarome any duty to defend or indemnify it with respect to two actions, one instituted in Pennsylvania and another in Missouri. We apply the "continuous trigger" doctrine of Owens-Illinois, Inc. v. United Insurance Co., 138 N.J. 437, 650 A.2d 974 (1994), and conclude that because the time of initial manifestation of the toxic-tort personal injuries at issue predated the applicable coverage periods, neither insurer had a duty to defend or indemnify, even though further progression of the disease may have occurred while the relevant policies were in effect. Thus, we affirm.

I.
Polarome is a distributor of food flavorings and fragrances, including diacetyl, a chemical used as a butter flavoring in the food industry. In 2005, Polarome was named as a defendant in multiple lawsuits alleging serious, continuing bodily injuries as a result of diacetyl inhalation, two of which are at issue here. Among other commercial general liability (CGL) policies *34 obtained by Polarome at various times, it was insured by Zurich from December 30, 1994, through December 17, 1998, and by Greenwich from December 31, 2003, through December 31, 2005.[1]

A. The Kuttner Litigation[2]
The Kuttner action, which was commenced on December 21, 2004, alleged injuries caused by exposure to diacetyl. Kuttner claimed he suffered from fatigue and shortness of breath, was diagnosed as having bronchiolitis obliterans, and underwent a lung transplant, all as a result of inhaling diacetyl beginning in 1973 while working at Shafco-Haakenson, Inc. Kuttner claimed he did not know until 2004 that he had been injured by diacetyl. The complaint was silent as to the date of last exposure, the date of diagnosis, and the date of the lung transplant.
Polarome demanded that Greenwich provide a defense in light of the two Greenwich policies covering the period beginning December 31, 2003, and ending December 31, 2005, which were CGL policies with a limit of $2 million for product liability. The "Insuring Agreements" in both Greenwich policies provide in pertinent part:
a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury". . . to which this insurance applies. . . . However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" . . . to which this insurance does not apply. . . .
. . . .
b. This insurance applies to "bodily injury" . . . only if:
(1) The "bodily injury" . . . is caused by an "occurrence" . . .;
(2) The "bodily injury" . . . occurs during the policy period. . . .
The Greenwich policies define "bodily injury" and "occurrence" as follows: "`Bodily injury' means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time," and "`[o]ccurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions."
Greenwich issued a reservation of rights and denial of coverage notice to Polarome, asserting that it could not determine when Kuttner was diagnosed with respiratory ailments and so it was reserving the right to deny coverage in the event that it discovered that he was diagnosed before the start of the policy period on December 31, 2003.
Polarome also demanded that Zurich provide a defense in the Kuttner action. The first Zurich policy covering the period beginning December 30, 1994, and ending December 17, 1995, was a CGL policy with a limit of $1 million for product liability. The insuring agreements in both Greenwich policies limit coverage to those injuries that occur during the policy period in the following way:
a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury". . . to which this insurance applies.. . . This insurance applies only to "bodily injury" . . . which occurs during the policy period. The "bodily injury". . . must be caused by an "occurrence." *35 . . . We will have the right and duty to defend any "suit" seeking those damages.
The second through fourth Zurich policies covering the period beginning December 17, 1995, and ending December 17, 1998, were also CGL policies with a $1-million limit for product liability. The "Insuring Agreement" provisions in these policies are identical to ¶¶ (a), (b)(1), and (b)(2) of the Greenwich "Insuring Agreement." All four Zurich policies define the terms "bodily injury" and "occurrence" identically to the Greenwich policies.
On August 24, 2005, Zurich advised Polarome that it would participate in the defense of the Kuttner action under a reservation of rights.[3] It advised Polarome that it had issued four policies between December 30, 1994, and December 17, 1998, that applied to bodily injury occurring during the policy periods and that there was insufficient information available in the Kuttner action to determine whether there was an occurrence resulting in bodily injury during the policy period. As a result, Zurich reserved its right to deny coverage "should it later be determined that there was not an occurrence resulting in bodily injury or that the bodily injury did not occur during the policy period." Zurich advised Polarome to tender the litigation to all other primary carriers.
During the course of discovery in the Kuttner action, Greenwich and Zurich obtained copies of medical records, which included a medical expert's August 21, 1987, report that opined that Kuttner had "severe obstructive lung disease." In another report, dated February 24, 1992, Dr. Harold I. Palevsky wrote that Kuttner "has a lengthy history of exposure to dusts and powders involved in the manufacturing of flavoring chemicals." Kuttner had been evaluated during a hospitalization in April 1991 and was diagnosed with severe chronic obstructive pulmonary disease (COPD) and was placed on home oxygen. Dr. Palevsky reported that Kuttner was a candidate for a single lung transplant and that he had "end stage lung disease with marked functional impairment." Kuttner had an x-ray performed on February 21, 1994, and the radiologist reported that the x-ray showed that Kuttner's left lung was normal but the right lung was hyperinflated due to COPD. On April 11, 1994, Dr. Palevsky wrote that Kuttner underwent a single lung transplant on October 28, 1993, that his post-operative course was relatively uncomplicated, and that "Kuttner has done very well since his transplant."
On July 26, 1994, Dr. Steven S. Scherer sent a consultation note to Dr. Palevsky, indicating that Kuttner "developed a peripheral neuropathy rather acutely" that spring. Kuttner had been diagnosed with diabetes and was hospitalized in June 1994 for stabilization of his diabetes. He noted that Kuttner had an EMG as an inpatient which documented "a mild to moderate axonal neuropathy apparently with superimposed proximal weakness that could either have been due to so-called diabetic amyotrophy or lumbar radiculopathy." On March 29, 1995, Kuttner's lungs were reevaluated by x-ray and the radiologist reported to Dr. Palevsky that his left lung was normal and the right lung showed continued COPD. Similar findings were made on May 31, 1995.
In his deposition, Kuttner testified that he began to experience daily shortness of breath as early as 1986. From 1986 through 1992, he had a persistent cough *36 and he would often get up during the night and spit up fluids. Kuttner was diagnosed with COPD in April 1991 and by March 1992 understood that it was a "blockage in the pulmonary system." At that time, his doctors informed him that he had end-stage lung disease and, without a lung transplant, he would die. Kuttner was aware that his exposure to chemicals at work was a possible cause of his COPD. However, he claims he did not learn that his condition may have been caused by diacetyl exposure until viewing a March 2004 news program about butter flavoring causing lung damage and lung transplants.
Kuttner also testified to his state of health in 2006: The lung transplant caused permanent numbness and pain on his left side and limited left-arm motion. Sometime after the transplant, he began to lose vision, was declared legally blind in 2005, and received specialized therapy for macular degeneration in 2006. He also developed gout in 1996 and continues to suffer painful attacks. He has neuropathy in his hands and feet, can no longer write or get dressed, and began taking pain medication for the neuropathy in 2003 or 2004. He developed a "necrosis" of his skin and on two occasions has had cancerous skin growths removed. He has unspecified kidney and prostate problems, swelling of the gums, and other dental problems. He has not had a sexual relationship with his wife since 1999.

B. The Blaylock Litigation[4]
Blaylock's action, which was filed on August 26, 2005, alleged that he suffered severe, progressive, and permanent lung damage from inhaling diacetyl at St. Louis Flavors in Missouri from September 2000 through November 2001. Polarome notified Greenwich of the lawsuit on October 12, 2005, and sought indemnification and defense under its policies.
On December 20, 2005, Greenwich wrote to Polarome and agreed to participate in the defense of the claim along with Polarome's other carriers while reserving its right to disclaim coverage.[5] Specifically, Greenwich notified Polarome, among other things, that its policy would only cover injuries that Blaylock sustained during the policy period, which began on December 31, 2003. It observed that Blaylock's complaint did not allege the date when he was diagnosed with his condition. Because the Greenwich policy would only cover injuries Blaylock sustained between December 31, 2003, and the date of his diagnosis, Greenwich cautioned Polarome to "place all insurance carriers on notice as the trigger of coverage would be from all dates of exposure beginning in September 2000 through the current policy."
During the course of discovery in the Blaylock action, Greenwich obtained copies of medical records, the first of which was a February 25, 2002, medical report indicating that Blaylock underwent a lung biopsy on February 12, 2002, which revealed bronchiolitis obliterans. That report referred to Blaylock's "small airway inflammatory disease" and asserted "his prognosis for recovery of pulmonary function is uncertain." The writer recommended that he not return to the work environment.
Blaylock was also evaluated for workers' compensation purposes on September 6, 2002. The compensation carrier's doctor discussed with Blaylock the relationship of his symptomatology to possible occupational *37 exposure and reported to the carrier that a CT scan performed one month earlier showed "only mildly bronchiectatic changes in some large to mid-sized airways as had been typically found but certainly no evidence of interstitial disease or mosaic pattern or Swiss cheese type pattern which would be seen with bronchiolitis obliterans."
Blaylock alleged that, since the date of his diagnosis, he has had difficulty sleeping, suffers from anxiety, and continues to have difficulty breathing. On November 14, 2002, the Social Security Administration disapproved Blaylock's claim for disability benefits because it determined that Blaylock's condition did not keep him from working as a "diary packer." On May 12, 2003, the Social Security Administration reconsidered Blaylock's claim and determined that he was disabled as of October 9, 2002.

C. Denial of Defense and Indemnity for Both Actions

On March 24, 2006, Greenwich denied coverage and withdrew from the defense of the Kuttner action. Greenwich explained that it had learned through discovery that Kuttner only worked at Shafco-Haakenson from 1973 through 1991. Additionally, Kuttner's medical records revealed that (1) he suffered from lung and breathing problems as early as 1983; (2) as early as 1991 the medical records noted that Kuttner had been exposed to diacetyl; (3) he was diagnosed with obstructive lung disease in 1993; (4) his lung transplant occurred in 1993; and (5) in 1994 a medical report named inhalation of chemicals at work as one risk factor. Because the policies only covered claims for bodily injury occurring during the policy periods and because Kuttner was diagnosed with these ailments before the start of any policy period, Greenwich withdrew its defense and refused to indemnify under its policies, which began on December 31, 2003.
On April 5, 2006, Greenwich denied defense and indemnification with respect to the Blaylock action. It explained that Blaylock was only exposed to Polarome's product between September 2000 and November 2001. Blaylock's medical records from as early as October 10, 2001, showed that he was treated for a respiratory condition and in March 2002 he filed for disability benefits, including Social Security disability benefits, due to lung damage, including bronchiolitis obliterans, which was later diagnosed on September 6, 2002. Greenwich stated that no bodily injury occurred to Blaylock during the Greenwich policy period because his diagnosis and impairment predated the policy period. Greenwich concluded that it owed no duty to defend Polarome in Blaylock's action and withdrew from the defense. Greenwich also stated it had no duty under its policy to indemnify Polarome with respect to any liability it may have to Blaylock. Then, on May 15, 2006, Zurich also denied coverage and withdrew from the defense of the Kuttner action for reasons substantially similar to those asserted by Greenwich.

II.
Polarome filed the complaint in this action against both insurers seeking a declaratory judgment that they each had a duty to defend the Kuttner action and indemnify Polarome with respect to any sums it was required to pay Kuttner. Polarome made a similar claim against Greenwich with respect to the Blaylock action. The parties filed dispositive motions, seeking summary judgment in whole or in part.
The trial judge entered orders on June 29, 2007, denying Polarome's motion and granting the cross-motions of Zurich and *38 Greenwich. He then placed a decision on the record on July 2, 2007. He made the following factual findings: Kuttner's bodily injury became manifest by October 1993 at the latest and his exposure to diacetyl began in 1973 and ended by October 1993. Zurich's initial policy commenced on December 17, 1994, and Greenwich's initial policy commenced on December 31, 2003. Blaylock's bodily injury became manifest at the latest by March 2002 and his exposure to diacetyl ended at that time.
The judge concluded that the continuous-trigger theory for determining the occurrence of a bodily injury, which was adopted by the Owens-Illinois Court, applied to this action. He stated that the conceptual underpinning of this theory is "that injury occurs during each phase of environmental contamination[,][t]hat is[,] exposure[;] exposure in residence, defined as further progression of injury even after exposure has ceased[;] and . . . manifestation of disease." He concluded that there was no legal support for Polarome's contention "that the duty [to defend] should also apply to policies issued after manifestation if there are allegations that the symptomatology of the manifested injury worsened during the subsequent policy periods" even in the absence of further exposure.
Next, the judge concluded that Zurich and Greenwich were not legally barred from withdrawing their defense of Polarome in both actions. He noted that Polarome had not cited any authority for the proposition that, after an insurer enters a defense under a reservation of rights, it could not withdraw upon discovery of extrinsic evidence demonstrating that the claim was not covered under the policy. He then rejected Polarome's argument that the carriers could not withdraw until there was a legal determination that the injuries were manifest prior to the policy inception. This appeal followed.

III.
Polarome contends that (1) the judge misconstrued the continuous-trigger theory; (2) separate bodily injuries can arise from one causative factor; (3) coverage is triggered under the policies in effect when each separate injury occurs; and (4) the judge was not authorized to consider any extrinsic evidence that might abrogate the duty to defend.
Insurance contracts are contracts of adhesion that are subject to special rules of interpretation. Longobardi v. Chubb Ins. Co., 121 N.J. 530, 537, 582 A.2d 1257 (1990); Meier v. N.J. Life Ins. Co., 101 N.J. 597, 611-12, 503 A.2d 862 (1986). An insurance carrier is "expert in its field and its varied and complex instruments are prepared by it unilaterally whereas the assured or prospective assured is a layman unversed in insurance provisions and practices." Allen v. Metro. Life Ins. Co., 44 N.J. 294, 305, 208 A.2d 638 (1965). When interpreting insurance policies, we "assume a particularly vigilant role in ensuring their conformity to public policy and principles of fairness." Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 175, 607 A.2d 1255 (1992).
Insurance policies are interpreted according to their plain and ordinary meaning. Longobardi, supra, 121 N.J. at 537, 582 A.2d 1257. In most instances, "policies should be construed liberally in. . . favor [of the insured] to the end that coverage is afforded `to the full extent that any fair interpretation will allow.'" Kievit v. Loyal Protective Life Ins. Co., 34 N.J. 475, 482, 170 A.2d 22 (1961) (citation omitted). Where there is a dispute over interpretation of the policy, "it is the insured's burden to bring the claim within the basic *39 terms of the policy." Rosario v. Haywood, 351 N.J.Super. 521, 529, 799 A.2d 32 (App. Div.2002) (quotations and citation omitted).
In the absence of an ambiguity, we may not engage in a strained construction to impose a duty on the carrier that is not contained in the policy. See Progressive Cas. Ins. Co. v. Hurley, 166 N.J. 260, 273, 765 A.2d 195 (2001). When the terms of the policy are clear, we must enforce them as written. Stone v. Royal Ins. Co., 211 N.J.Super. 246, 248, 511 A.2d 717 (App.Div.1986); see also Flynn v. Hartford Fire Ins. Co., 146 N.J.Super. 484, 488, 370 A.2d 61 (App.Div.), certif. denied, 75 N.J. 5, 379 A.2d 236 (1977). We may not make a better policy for the parties than the one they purchased. Flynn, supra, 146 N.J.Super. at 488, 370 A.2d 61; see also Weedo v. Stone-E-Brick, Inc., 81 N.J. 233, 247, 405 A.2d 788 (1979).
Where an ambiguity exists, it is ordinarily resolved in favor of the insured. Cruz-Mendez v. ISU/Ins. Servs., 156 N.J. 556, 571, 722 A.2d 515 (1999); Doto v. Russo, 140 N.J. 544, 556, 659 A.2d 1371 (1995); Lundy v. Aetna Cas. & Sur. Co., 92 N.J. 550, 559, 458 A.2d 106 (1983). However, an ambiguity does not arise simply because the parties have offered two conflicting interpretations. Rosario, supra, 351 N.J.Super. at 530-31, 799 A.2d 32. Rather, a genuine ambiguity exists only if the "phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage." Weedo, supra, 81 N.J. at 247, 405 A.2d 788.
Even if a particular phrase or term is capable of being interpreted in the manner sought by the insurer, "where another interpretation favorable to the insured reasonably can be made that construction must be applied." Ellmex Const. Co., Inc. v. Republic Ins. Co., 202 N.J.Super. 195, 204, 494 A.2d 339 (App.Div.1985), certif. denied, 103 N.J. 453, 511 A.2d 639 (1986). In this regard, coverage clauses should be interpreted liberally, whereas those of exclusion should be strictly construed. Butler v. Bonner & Barnewall, Inc., 56 N.J. 567, 576, 267 A.2d 527 (1970); Ellmex Constr. Co., Inc., supra, 202 N.J.Super. at 205, 494 A.2d 339. Finally, insurance contracts are to be construed in a manner that recognizes the reasonable expectation of the insured. Zuckerman v. Nat. Union Fire Ins., 100 N.J. 304, 320-21, 495 A.2d 395 (1985).
[Simonetti v. Selective Ins. Co., 372 N.J.Super. 421, 429, 859 A.2d 694 (App. Div.2004).]
As a general proposition, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995). The interpretation of an insurance contract is a question of law which we decide independently of a trial court's conclusions. Simonetti, supra, 372 N.J.Super. at 428, 859 A.2d 694; Nat'l Union Fire Ins. Co. v. Transp. Ins. Co., 336 N.J.Super. 437, 443, 765 A.2d 240 (App.Div.2001). Because each of the issues raised by Polarome presents a question of law, we review the judge's rulings in this case de novo. See Raspa v. Office of Sheriff of Gloucester, 191 N.J. 323, 335, 924 A.2d 435 (2007).

IV.
We begin with Polarome's contention that the judge misconstrued the continuous-trigger theory. In this respect, Polarome makes three related arguments. First, it contends that the judge erroneously assumed that the conceptual underpinning of New Jersey's continuous-trigger *40 theory is the time-on-the-risk method of allocating multiple policies to the loss. Instead, Polarome asserts that the continuous-trigger theory arises from the plain language of CGL policies, which are intended to provide the broadest possible coverage under each and every policy where bodily injury occurs during the policy period. Second, Polarome asserts that the judge erroneously employed the time-on-the-risk methodology to constrict coverage by compressing the trigger period to the date of first diagnosis of any bodily injury. It contends that doing so was contrary to Owens-Illinois, supra, 138 N.J. 437, 650 A.2d 974, and had the effect of inserting a noncumulation clause into Polarome's insurance program. Third, Polarome argues that the judge erred in construing Owens-Illinois as holding that the manifestation of any injury terminates coverage for all subsequent, related injuries because the Owens-Illinois Court expressly declined to answer this question.

A.
Our consideration of Polarome's contentions necessarily begins with the principles delineated in the Court's opinion in Owens-Illinois. The Court identified three "most frequently offered theories for the trigger of coverage[:] (1) the exposure theory, (2) the manifestation theory, and (3) the continuous-trigger theory." Owens-Illinois, supra, 138 N.J. at 449, 650 A.2d 974. The Court stated that "[t]he conceptual underpinning of the continuous-trigger theory . . . is that injury occurs during each phase of environmental contamination  exposure, exposure in residence (defined as further progression of injury even after exposure has ceased), and manifestation of disease." Id. at 451, 650 A.2d 974.
In selecting an appropriate approach to trigger of coverage, the Court considered one well-settled rule: "the time of the occurrence of an accident within the meaning of an indemnity policy is not the time the wrongful act is committed but the time when the complaining party is actually damaged." Id. at 452, 650 A.2d 974 (citing Hartford Accident & Indem. Co. v. Aetna Life & Cas. Ins. Co., 98 N.J. 18, 483 A.2d 402 (1984)). This is so because "`[t]he tort of negligence is not committed unless and until some damage is done.'" Id. at 453, 650 A.2d 974 (quoting Hartford, supra, 98 N.J. at 27, 483 A.2d 402).
The Court found no ambiguity in the "occurrence" clause in the policies there in question. However, it recognized that "[w]hat is not so easily understandable is the point at which the law will say that injury requires indemnity. In that sense, the concept of injury, like the related concepts of duty and causation, is an instrument of policy." Id. at 457, 650 A.2d 974. After discussing two toxic-tort cases, Ayers v. Township of Jackson, 106 N.J. 557, 598-99, 525 A.2d 287 (1987), and Mauro v. Raymark Industries, Inc., 116 N.J. 126, 143, 561 A.2d 257 (1989), and the uncertainties of medical causation, Owens-Illinois, supra, 138 N.J. at 458-59, 650 A.2d 974, the Court observed, "[m]ass-exposure toxic-tort cases have simply exceeded the capacity of conventional models of judicial response." Id. at 459, 650 A.2d 974. Although the Ayers Court called for a legislative compensation procedure, "[n]o such procedure has been forthcoming." Ibid. Thus, the Court concluded that common-law doctrines had to be adapted "`to the peculiar characteristics of toxic-tort litigation.'" Ibid. (quoting Ayers, supra, 106 N.J. at 581, 525 A.2d 287). The Court determined that "common-law resolution of the trigger-of-coverage issue requires that we consider, at the same time, the issue of scope of coverage if a policy is triggered." Ibid.
*41 The Court first considered the joint-and-several allocation method adopted in Keene Corp. v. Insurance Co. of North America, 667 F.2d 1034 (D.C.Cir.1981), cert. denied, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982). Owens-Illinois, supra, 138 N.J. at 459-62, 650 A.2d 974. It next considered the pro-rata allocation method, which is based on the number of years on the risk, that was adopted in Insurance Co. of North America v. Forty-Eight Insulations, Inc., 633 F.2d 1212 (6th Cir. 1980), clarified, 657 F.2d 814 (6th Cir.), cert. denied, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981). Owens-Illinois, supra, 138 N.J. at 462-64, 650 A.2d 974. The Court concluded that the language of the policies requiring the insurers to pay as a result of personal injury during the policy period simply did not resolve the allocation issue because that language "was never intended to cover apportionment when continuous injury occurs over multiple years." Id. at 466, 650 A.2d 974. The Court also found that the "legal concepts of injury, defect, negligence, and damages" were not well suited "in the case of gradual release of contaminants." Ibid.
The Court concluded that it was "unable to find the answer to allocation in the language of the policies." Id. at 468, 650 A.2d 974. As a result, the Court decided the allocation issue based on the public-interest factors set forth in Ayers, id. at 471, 650 A.2d 974 (citing Ayers, supra, 106 N.J. at 608-10, 525 A.2d 287), and held that
when progressive indivisible injury or damage results from exposure to injurious conditions for which civil liability may be imposed, courts may reasonably treat the progressive injury or damage as an occurrence within each of the years of a CGL policy. That is the continuous-trigger theory for activating the insurers' obligation to respond under the policies.
Although the use of a continuous trigger for property damage attributable to long-term embedding of contaminants is more problematic . . . , the latent nature of such property damage, at least in the case of asbestos products, is sufficiently analogous to that in personal injury to warrant use of a continuous trigger under the terms we have outlined. We need not resolve in these cases exactly when the continuum ends in the contexts of bodily injury and property damage.
[Id. at 478-79, 650 A.2d 974 (emphasis added); see also Benjamin Moore & Co. v. Aetna Cas. & Sur. Co., 179 N.J. 87, 98, 843 A.2d 1094 (2004); Carter-Wallace, Inc. v. Admiral Ins. Co., 154 N.J. 312, 320-22, 712 A.2d 1116 (1998).]
Polarome's argument that the trial judge misconstrued Owens-Illinoisbecause he assumed the conceptual underpinning of the continuous-trigger theory was the time-on-the-risk allocation of coveragesimply misstates the judge's discussion of Owens-Illinois. In actuality, the judge said the conceptual underpinning of continuous-trigger theory was "that injury occurs during each phase of environmental contamination, that is: exposure; exposure in residence, defined as further progression of injury even after exposure has ceased; and . . . manifestation of disease." Further, contrary to Polarome's contention, the continuous-trigger theory does not "arise[] from the plain language of CGL policies." Rather, although the Supreme Court did state that the unambiguous words in CGL "occurrence" clauses "are all familiar and easily understandable," it went on to state that "[w]hat is not so easily understandable is the point at which the law will say that injury requires indemnity. In that sense, the concept of injury, like the related concepts of duty and causation, is an instrument of policy." *42 Owens-Illinois, supra, 138 N.J. at 457, 650 A.2d 974; see also Benjamin Moore, supra, 179 N.J. at 97, 843 A.2d 1094 (observing that "because historically CGL policies provided no guidance regarding the point at which a long-tail environmental injury becomes an occurrence, it was left to courts to resolve the issue"). The policy the Owens-Illinois Court adopted for toxic-tort cases in order to resolve the issue was a continuous-trigger theory of the "occurrence" of injury. Owens-Illinois, supra, 138 N.J. at 474, 478, 650 A.2d 974. We find no error in the judge's interpretation of Owens-Illinois.

B.
Next, Polarome argues that the judge erroneously used the "time-on-the-risk allocation methodology to deactivate [its] coverage for provable bodily injuries" occurring within the continuous trigger "by compressing the trigger period to the date of first diagnosis of any bodily injury," thus decreasing "the insurance coverage available to compensate the allegedly injured claimants." Polarome argues that the effect of the judge's ruling was to "insert[] a noncumulation clause into [its] insurance program where none existed."[6] It argues that the Supreme Court has determined that such clauses are unenforceable because Owens-Illinois rejected the notion that the continuous trigger relates to "a `single occurrence' with multiple year effects," quoting Spaulding Composites Co. v. Aetna Casualty & Surety Co., 176 N.J. 25, 44, 819 A.2d 410 (2003).
Polarome misconceives the holding in Spaulding, where the Court observed that "a non-cumulation clause governs successive policies and prevents the accretion of limits when the policies have been triggered by a single occurrence," id. at 42, 819 A.2d 410, and then held,
At the heart of a non-cumulation clause is the notion of a "single occurrence" with multiple year effects. Underlying that notion is the "single occurrence" language of the clause that states that damage "arising out of continuous or repeated exposure to substantially the same general conditions shall be construed as arising out of one occurrence." What the non-cumulation clause seeks to avoid is the "cumulation" of insurance policy limits when only one insured act or "occurrence" is involved. Owens-Illinois clearly rejected the idea that in an environmental exposure case, successive policies are triggered by a "single" occurrence.
. . . .
[T]he "single occurrence" language does not implicate "cumulation" of policy limits for damage arising out of a single occurrence and is therefore inapplicable by its own terms.
But even if the non-cumulation clause was not facially inapplicable, we would not enforce it because it would thwart the Owens-Illinois pro-rata allocation modality.
[Spaulding, supra, 176 N.J. at 44, 819 A.2d 410.]
After so ruling, the Court observed that its "sole determination in this case is that Liberty's non-cumulation clause is unenforceable under Owens-Illinois. We take no position on the number of occurrences . . . or any other issue except to reaffirm the vitality of the Owens-Illinois approach and our commitment to its uniform application." Id. at 46, 819 A.2d 410.
Here, the judge recognized that policies issued to Polarome during and prior *43 to 1993 were on the risk in the Kuttner action and that the policies covering the period ending in September 2002 were on the risk in the Blaylock action. He did not bar Polarome from cumulating the limits of such policies. Polarome simply confuses the Spaulding Court's conclusion that non-cumulation clauses were not applicable to environmental-exposure cases or were unenforceable under Owens-Illinois with the inquiry Owens-Illinois mandates with respect to the end of the continuous triggermanifestation of disease related to the toxin to which the claimant was exposed.

C.
Last, Polarome contends that the judge erred in concluding from Owens-Illinois that "the `manifestation' of any injury terminates coverage for all subsequent, related injuries." It argues that the Court expressly declined to answer this question in the last sentence of the summary of its holdings where the Court stated: "We need not resolve in these cases exactly when the continuum ends in the contexts of bodily injury and property damage." Owens-Illinois, supra, 138 N.J. at 479, 650 A.2d 974. Polarome asserts that "the continuous trigger provides coverage for all `provable damages,'" requiring determination of coverage to be case specific, and that "`injury may mean different things in different contexts,'" quoting Owens-Illinois, supra, 138 N.J. at 457, 478-79, 650 A.2d 974. Polarome then argues that "the Court declined to define an arbitrary terminus of coverage for bodily injury because there is no such terminus." Thus, Polarome asserts, there was nothing in Owens-Illinois that "authorized the [judge] to rule that coverage for `provable damages' ceased to occur when some bodily injuries manifested or were `diagnosed.'"[7]
Polarome overstates the holdings in Owens-Illinois and confuses legal concepts governing continuous-trigger theory as a means to determine occurrences under CGL policies with those governing recoverable damages from a tortfeasor. The Court's statement in Owens-Illinois that it did not need to resolve when the continuum ends must be understood in the context of what the Court was attempting to accomplish in the coverage dispute before it. On that issue, the Court stated,
At least in the context of asbestos-related personal injury and property damage, the rules that we adopt will attempt to relate the theory of a continuous trigger causing indivisible injury to the degree of risk transferred or retained in each of the years of repeated exposure to injurious conditions.

[Id. at 474-75, 650 A.2d 974 (emphasis added); see also Carter-Wallace, supra, 154 N.J. at 320-21, 712 A.2d 1116.]
Thus, under Owens-Illinois, courts "need not resolve . . . exactly when the continuum ends" where the CGL policies cover only "the years of repeated exposure to injurious conditions." Owens-Illinois, supra, 138 N.J. at 475, 479, 650 A.2d 974. However, that is not the case here, because it was undisputed that Kuttner's exposure ended in 1991 and Blaylock's exposure ended in 2001before any of the applicable policies at issue commenced. Accordingly, unlike the Court in Owens-Illinois, here it was and is necessary to resolve "exactly when the continuum ends." See id. at 479, 650 A.2d 974.
*44 In that respect, we initially note that the Owens-Illinois Court rejected the insurers' argument that injury must occur in the policy period because that argument was inconsistent with the fundamental concept that an insurer must indemnify for all damages attributable to an accident, even though the full extent of the injuries might not be realized until after the policy lapses. See id. at 465, 650 A.2d 974.
In Champion Dyeing & Finishing Co. v. Centennial Insurance Co., the insurers argued that "occurrence-based insurance does not operate prospectively to afford coverage for injuries sustained after the policy period has ended." 355 N.J.Super. 262, 276, 810 A.2d 68 (App.Div.2002). We rejected that argument because Owens-Illinois "recognized an insurer's obligation to indemnify for subsequent damages attributable to an injury occurring during the relevant policy period." Ibid. Thus, we required Champion's insurers to indemnify for subsequent damages occurring during a period when Champion was unable to secure tank insurance. Id. at 277, 810 A.2d 68.
This view is consistent with statements of the Supreme Court in Quincy Mutual Fire Insurance Co. v. Borough of Bellmawr, 172 N.J. 409, 799 A.2d 499 (2002). There, the Court stated that in Owens-Illinois "we held that in asbestos-related personal injury cases the required damage occurs from the time asbestos fibers are inhaled and continues until and including the manifestation of an asbestos-related disease." Id. at 419, 799 A.2d 499 (emphasis added) (citing Owens-Illinois, supra, 138 N.J. at 454, 650 A.2d 974); see also Williams v. Port Auth. of N.Y. & N.J., 175 N.J. 82, 91, 813 A.2d 531 (2003) ("[I]njury will be presumed to have occurred beginning with the early exposure and continued throughout the exposure even though manifestation of a disease may not occur until the exposure had ended.").
With those concepts in mind, we turn to the issue of when the continuum ends, which has been characterized as "the last pull of the trigger[, i.e.,] the end of the covered `occurrence.'" Quincy Mut. Fire Ins. Co. v. Borough of Bellmawr, 338 N.J.Super. 395, 411, 769 A.2d 1053 (App. Div.2001) (Wecker, J., dissenting), rev'd on other grounds, 172 N.J. 409, 799 A.2d 499 (2002).
We are cognizant of the fact that the Owens-Illinois Court adopted the continuous-trigger theory "in large part because of its ability to maximize coverage." Quincy Mutual, supra, 172 N.J. at 433-34, 799 A.2d 499. That benefit, however, does not mandate triggering every CGL policy from first exposure until a claim is made or death occurs: "Our reliance on the notion of `maximization of resources' in Owens-Illinois reflected only the fact that our methodology allowed an insured access to multiple insurance policies based on our definition of `occurrence.'" Benjamin Moore, supra, 179 N.J. at 107, 843 A.2d 1094.
Further, we are aware of "`the law's solicitousness for victims of mass toxic torts and other environmental contamination[, which] is entirely consistent with choosing that conceptually viable trigger theory affording the greatest ultimate redress.'" Quincy Mutual, supra, 172 N.J. at 434, 799 A.2d 499 (quoting Winding Hills Condo. Ass'n, Inc. v. N. Am. Specialty Ins. Co., 332 N.J.Super. 85, 91, 752 A.2d 837 (App.Div.2000)). We do not find this concern inconsistent with a conclusion that the last pull of the trigger occurs with the initial manifestation of a toxic-tort personal injury. Upon initial manifestation, the "scientific uncertainties" that led to adoption of the continuous-trigger approach, Benjamin Moore, supra, 179 N.J. at 98, *45 843 A.2d 1094, no longer exist. It is only "progressive indivisible injuries [that] `should be treated as an occurrence within each of the years of a CGL policy.'" Id. at 101, 843 A.2d 1094 (citing Spaulding, supra, 176 N.J. at 44, 819 A.2d 410). The sequelae of that initially manifested injury and all subsequent, related injuries are no longer indivisible simply because there has been an initial manifestation. It is only the undetectable injuries at and after exposure and prior to initial manifestation that are progressive and indivisible such that the occurrence of an injury cannot be known.
We find no error in the judge's conclusion that the last pull of the trigger is the initial manifestation of a diacetyl-related personal injury. The issue of scientific uncertainties as to the precise date when injury first occurs in a toxic-tort personal injury case was resolved by adopting the continuous-trigger theory, thus ending the debate over whether the injury occurred at first exposure, when the injury was manifested, or sometime between those two events. Once a diacetyl-related personal injury is initially manifest, the scientific uncertainties are laid to rest and subsequent CGL policies are not triggered.

V.
Polarome next contends that separate bodily injuries can arise from one causative factor. It argues that the claims are the terminus of continuous progressive personal injury and "are the touchstone for interpreting the scope of the continuous trigger." It cites Mauro, supra, 116 N.J. 126, 561 A.2d 257, as representing two lines of cases. According to Polarome, the first line holds that "pain, suffering and emotional distress are `bodily injuries' that are separately compensable from accompanying physical injuries;" and the second line holds "that separate physical injuries arising from the same cause at different times may be asserted in separate actions."
Mauro involved a product liability suit against manufacturers of asbestos-containing products to which Mauro was exposed in the course of his employment. Id. at 128-29, 561 A.2d 257. No carriers were a party to the action, no coverage issue was presented, and the Court did not consider the continuous-trigger theory. The issue presented was whether the trial court erred when it "withdrew from the jury's consideration plaintiff's claim for damages based on his enhanced risk of cancer." Id. at 128, 561 A.2d 257. The Court found no error because the medical proofs did not establish an enhanced risk to a reasonable degree of medical probability. Id. at 145, 561 A.2d 257. However, in doing so, the Court removed statutes of limitation and the entire-controversy doctrine as bars to institution of a subsequent action seeking damages in the event that the risk of cancer materialized. Id. at 143, 561 A.2d 257; accord, Ayers, supra, 106 N.J. at 584, 525 A.2d 287.
We do not see Mauro and Ayers, or indeed any of the other cases cited in this respect by Polarome,[8] as affecting the terminus for the continuous-trigger theory of coverage. If, as we have now held, the initial clinical manifestation of asbestosrelated disease is the last pull of the trigger, then any subsequent action under Mauro and Ayers would simply require defense and indemnification from the carriers on the risk from initial exposure to *46 initial clinical manifestation. Mauro and Ayers do not require any other result. Indeed, CGL policies generally undertake to pay those sums an insured becomes legally obligated to pay as damages, and the law permits recovery for the full extent of the harm proximately caused.
We also find no merit to Polarome's argument that coverage is triggered for all separate, related bodily injuries that occur over multiple policy periods. It contends that "a number of decisions applying New Jersey law have held that insurance coverage continues as long as injury or damage occurs in the policy period," citing Sandoz, supra, 554 F.Supp. 257, and Lac d'Amiante du Quebec, Ltee. v. American Home Assurance Co., 613 F.Supp. 1549 (D.N.J. 1985), vacated in part on other grounds, 864 F.2d 1033 (3d Cir.1988).[9] These cases were decided well before Owens-Illinois and cannot be considered as limiting or expanding its holding.
Polarome also argues that property-damage claims arising from long-term exposure to asbestos and pollutants "are analogous to bodily injury claims relating to long-term exposure to toxic substances," and support triggering coverage through the date of the claims made here, citing Owens-Illinois, supra, 138 N.J. at 455, 650 A.2d 974, and Morrone v. Harleysville Mutual Insurance Co., 283 N.J.Super. 411, 662 A.2d 562 (App.Div.1995). However, in Morrone there was no need to establish the last pull of the trigger because the carrier was on the risk during the time Morrone contaminated his own property and the groundwater flowing through it. Morrone, supra, 283 N.J.Super. at 414, 662 A.2d 562. Polarome also cites Astro Pak Corp. v. Fireman's Fund Insurance Co., 284 N.J.Super. 491, 665 A.2d 1113 (App.Div.), certif. denied, 143 N.J. 323, 670 A.2d 1065 (1995), and Pittston, supra, 905 F.Supp. 1279, for the proposition that the continuous trigger extends until claims are made against the insured, which would bring coverage here to the date of service of the complaints upon it.
In Astro Pak we rejected Hartford's argument that it was not responsible under a continuous-trigger analysis because the record established that "the slow progression of these contaminants into the surrounding land and water continued well after" the landfill was closed and dumping ended. Astro Pak, supra, 284 N.J.Super. at 500, 665 A.2d 1113. In other words, the contamination was still in the exposure-in-residence phase of the continuous-trigger theory. Thus, Astro Pak provides no support for Polarome's contention that coverage continues to be triggered until the insured is notified of the claim. As Polarome points out, the Pittston court did say that "an occurrence triggering coverage under a CGL policy continues over a span of time, beginning from the first exposure to injurious conditions, continuing through any period of latency or while the resulting damage remains undiscovered, and ending at the time the injury manifests itself to the insured." Pittston, supra, 905 F.Supp. at 1297 (citations omitted). However, in that case, while Pittston still owned the property at issue, it received a 1979 environmental report disclosing that its soil, groundwater, and vegetation were contaminated; and the claims against Pittston were made in 1988. Id. at 1291. The court held that Travelers' Insurance Company had no duty to defend or indemnify Pittston under any policy issued after 1979. Id. at 1291, 1332. This case clearly does not support Polarome's contention *47 that the continuous trigger extends until Polarome learned of the claims made against it and, in fact, is consistent with our conclusion that the trigger ends with initial manifestation of diacetyl-related disease. Thus, we adhere to our determination that the end of the continuous trigger in New Jersey for personal injuries caused by toxic exposures is the initial manifestation of toxin-related disease.

VI.
Finally, Polarome contends that, even if the judge correctly applied the continuous-trigger theory, he nonetheless erred in concluding that the insurers could withdraw from the defense of the underlying actions based on information obtained during discovery. It urges that courts are not permitted to consider any extrinsic evidence respecting the duty to defend unless the evidence supports coverage under the policy, citing SL Industries, Inc. v. American Motorists Insurance Co., 128 N.J. 188, 198-99, 607 A.2d 1266 (1992). Polarome argues that extrinsic evidence relating to "ultimate indemnity questions cannot nullify a duty to defend that has been properly triggered" by comparing the allegations in the complaint with the terms of the policy. Further, it argues that insurers must pursue the defense until all claims are resolved based on a Supreme Court statement that "`[w]hen multiple alternative causes of action are stated, the duty will continue until every covered claim is eliminated,'" quoting Voorhees, supra, 128 N.J. at 174, 607 A.2d 1255.[10]
As a general proposition, a liability insurer has a contractual obligation to provide a sufficient defense against all actions covered by the insurance policy. Hartford, supra, 98 N.J. at 22, 483 A.2d 402. Its duty to defend is broader than its duty to indemnify. Rosario, supra, 351 N.J.Super. at 534, 799 A.2d 32. The duty to defend is triggered by a complaint alleging a covered claim. Voorhees, supra, 128 N.J. at 173, 607 A.2d 1255 (citation omitted). "[T]he complaint should be laid alongside the policy and a determination made as to whether, if the allegations are sustained, the insurer will be required to pay the resulting judgment, and in reaching a conclusion, doubts should be resolved in favor of the insured." Danek v. Hommer, 28 N.J.Super. 68, 77, 100 A.2d 198 (App.Div.1953), aff'd, 15 N.J. 573, 105 A.2d 677 (1954). "It is the nature of the claim for damages . . . [that] triggers the obligation to defend." L.C.S., Inc. v. Lexington Ins. Co., 371 N.J.Super. 482, 490, 853 A.2d 974 (App.Div.2004). The insurer remains obligated to defend even if the claims are meritless, fraudulent, or "poorly developed and almost sure to fail." Voorhees, supra, 128 N.J. at 174, 607 A.2d 1255 (citation omitted). However, that obligation does not extend to "claims which would be beyond the covenant to pay if the claimant prevailed." Burd v. Sussex Mut. Ins. Co., 56 N.J. 383, 389, 267 A.2d 7 (1970); see also Danek, supra, 28 N.J.Super. at 77, 100 A.2d 198 (drawing a distinction between groundless actions and ones that, "even if successful, would not be within the policy coverage").
"[T]he duty to defend is not necessarily limited to what is set forth in the complaint." Jolley v. Marquess, 393 N.J.Super. 255, 271, 923 A.2d 264 (App. Div.2007). "[F]acts indicating potential coverage that arise during the resolution of the underlying dispute . . . may trigger the duty to defend." SL Indus., supra, *48 128 N.J. at 198, 607 A.2d 1266. The SL Court reasoned, "To allow the insurance company `to construct a formal fortress of the . . . pleadings and to retreat behind its walls, thereby successfully ignoring true but unpleaded facts within its knowledge that require it, under the insurance policy, to conduct the putative insured's defense,' would not be fair." Id. at 199, 607 A.2d 1266 (quoting Associated Indem. v. Ins. Co. of N. Am., 68 Ill.App.3d 807, 25 Ill. Dec. 258, 386 N.E.2d 529, 536 (1979)). This is so because "`an insurer's duty is measured by the facts.'" Ibid. (quoting J.A. Appleman, 7C Insurance Law and Practice § 4683, at 56 (Berdal ed. 1979)).
Neither the duty to defend nor the duty to indemnify "exists except with respect to occurrences for which the policy provides coverage." Hartford, supra, 98 N.J. at 22, 483 A.2d 402. It is the "obligation to indemnify, either actual or potential, which invokes the duty to defend." Hartford Ins. Group v. Marson Constr. Corp., 186 N.J.Super. 253, 260, 452 A.2d 473 (App.Div.1982), certif. denied, 93 N.J. 247, 460 A.2d 656 (1983).
When the duty to indemnify "depends upon a factual issue which will not be resolved by the trial of the third party's suit against the insured, the duty to defend may depend on the actual facts and not upon the allegations in the complaint." Burd, supra, 56 N.J. at 388, 267 A.2d 7; cf. Hebela v. Healthcare Ins. Co., 370 N.J.Super. 260, 268, 851 A.2d 75 (App. Div.2004) (holding that usually, but not always, the duty to defend is fixed by the complaint).
The sense of the covenant is to defend suits involving claims which the carrier would have to pay if the claimant prevailed in the action. The covenant to defend is thus identified with the covenant to pay. That is the basis of the rule that ordinarily a carrier who defends unsuccessfully may not later deny coverage, absent an express agreement with the insured reserving a right to deny coverage. The obligation to defend "groundless, false or fraudulent" claims does not mean that the carrier will defend claims which would be beyond the covenant to pay if the claimant prevailed. It means only that a carrier may not refuse to defend a suit on the ground that the claim asserted against the insured cannot possibly succeed because either in law or in fact there is no basis for a plaintiff's judgment.
[Burd, supra, 56 N.J. at 388-89, 267 A.2d 7 (citation omitted).]
We have found no language in SL Industries or Burd that supports Polarome's contention that extrinsic evidence may only be considered to support coverage rather than to prove that the claims are not covered by the policy. If an insurer believes that the evidence indicates that the claim is not covered, the insurer is not always required to provide a defense. George J. Kenny and Frank A. Lattal, New Jersey Insurance Law § 4-5:1, at 117 (2000). In fact, the Burd Court established the procedure for resolving factual disputes pertaining to the scope of coverage:
Whenever the carrier's position so diverges from the insured's that the carrier cannot defend the action with complete fidelity to the insured, there must be a proceeding in which the carrier and the insured, represented by counsel of their own choice, may fight out their differences. That action may . . . follow the trial of the third party's suit against the insured. Or, unless for special reasons it would be unfair to do so, a declaratory judgment proceeding may be brought in advance of that trial by the carrier or the insured, to the end that *49 the third-party suit may be defended by the party ultimately liable.
[Burd, supra, 56 N.J. at 391, 267 A.2d 7 (citation omitted).]
In Hartford, supra, 98 N.J. at 21, 483 A.2d 402, the Court considered a dispute between two insurers that sold consecutive policies to a drug manufacturer that was subsequently confronted with a suit alleging damages based on its failure to warn. Although the timing of the injury would not be relevant in the underlying tort case, it was central to a determination as to which insurer was responsible for the defense. Id. at 25, 483 A.2d 402. The Court affirmed the trial and appellate court decisions that an insurer does not breach its duty to defend when it denies coverage based on "the existence of a substantial issue as to whether its policy provided coverage for that claim." Id. at 26, 483 A.2d 402. In such a case, extrinsic evidence beyond the four corners of the complaint may be examined to determine whether the insurer would have any obligation to pay if the claim was successful and, if not, then the insurer's duty to defend the claim may be negated. Id. at 28, 483 A.2d 402.
Thus, if there is a factual dispute that, once resolved, may indicate that an occurrence is not covered, and it is unlikely to be resolved at trial, an insurer may deny coverage and await judicial resolution. Heldor Indus., Inc. v. Atl. Mut. Ins. Co., 229 N.J.Super. 390, 399, 551 A.2d 1001 (App.Div.1988). A court will only estop an insurer from withdrawing from a defense that it initially assumed if the insurer is aware of evidence indicating that the claim is not covered and it fails to notify its insured promptly that it was reserving its right to withdraw:
Upon the receipt from its insured of a claim or notification of an incident that may give rise to a claim, an insurer is entitled to a reasonable period of time in which to investigate whether the particular incident involves a risk covered by the terms of the policy. But once an insurer has had a reasonable opportunity to investigate, or has learned of grounds for questioning coverage, it then is under a duty promptly to inform its insured of its intention to disclaim coverage or of the possibility that coverage will be denied or questioned.
[Griggs v. Bertram, 88 N.J. 347, 356-57, 443 A.2d 163 (1982) (citations omitted).]
An insurer is not obligated to seek a declaratory judgment before disclaiming coverage. Burd, supra, 56 N.J. at 391-92, 267 A.2d 7. However, an insurer that withdraws its defense and fails to seek a declaratory judgment risks being responsible for reimbursing the insured for its defense costs if the underlying claim is determined to be within the scope of the policy:
The insurer need not provide the defense at the outset if the allegations include claims that are not covered by the policy as well as claims that are covered or if the question of coverage is not, by its nature, capable of determination in the underlying action against the insured. In those situations, the insurer's obligation to defend becomes an obligation to reimburse for defense costs to the extent that the defense is later determined to have been attributable to the covered claims and, if coverage is not determinable in the underlying action, it is later determined that there was in fact coverage.
[Muralo Co. v. Employers Ins. of Wausau, 334 N.J.Super. 282, 289-90, 759 A.2d 348 (App.Div.2000) (citations omitted), certif. denied, 167 N.J. 632, 772 A.2d 934 (2001).]
*50 The underlying complaints here were ambiguous as to the occurrences triggering coverage. Kuttner did not allege the dates when his exposure to diacetyl ended, when exposure in residence, if any, manifested as a diacetyl-related disease, or when he underwent a lung transplant. Blaylock did allege the date when exposure ended, but did not allege when exposure in residence, if any, manifested as a diacetyl-related disease. As a consequence, Greenwich and Zurich could not determine from the four corners of the complaints whether their duty to indemnify, and thus their duty to defend, was triggered. The ambiguities in these complaints brings this case squarely within our holding in Aetna Casualty & Surety Co. v. Ply Gem Industries, Inc., because there was "no way to determine, without more, whether the allegations of [personal injury] caused by the insured's product were covered claims because they occurred during the policy periods." 343 N.J.Super. 430, 453-54, 778 A.2d 1132 (App.Div.), certif. denied, 170 N.J. 390, 788 A.2d 774 (2001). Thus, Greenwich and Zurich could examine extrinsic evidence to determine whether the last pull of the continuous trigger established that they had no duty to indemnify, and thus, no duty to defend. See id. at 452-53, 778 A.2d 1132. They both undertook the defense of Polarome under a reservation of rights as to both defense and indemnification. They were "entitled to a reasonable period of time in which to investigate whether the particular incident involve[d] a risk covered by the terms of the policy." Griggs, supra, 88 N.J. at 357, 443 A.2d 163. Having "learned of the grounds for questioning coverage," they promptly notified Polarome of their "intention to disclaim coverage" and withdrew from its defense. Ibid. On these facts, we are satisfied that the insurers did not breach their duty to defend Polarome in connection with these diacetyl-related claims.
Affirmed.
NOTES
[1] Polarome was insured by The Hartford from December 17, 1998, through December 31, 2003. The Hartford did not refuse to defend and is not a party to this action.
[2] Kuttner v. Ungerer & Co., Inc., No. 02199, was filed in a Pennsylvania state court and removed to the United States District Court for the Eastern District of Pennsylvania.
[3] The Hartford Fire Insurance Company (Hartford) agreed to participate in the defense of the Kuttner action under a reservation of rights on August 5, 2005. Polarome was insured by Hartford December 17, 1986, and for five years beginning on December 17, 1998. It has not disclaimed coverage for those years.
[4] Blaylock v. Polarome, Inc., No. 052-10421, was filed in the Circuit Court of Missouri.
[5] The Hartford Fire Insurance Company agreed to participate in the defense of the Blaylock action under a reservation of rights on November 1, 2005.
[6] This is not an entirely correct statement because the Greenwich policies did indeed have a noncumulation provision in the definition of "bodily injury."
[7] Polarome finds additional support for its argument in Pittston Co. v. Allianz Insurance Co., 905 F.Supp. 1279 (D.N.J. 1995), rev'd on other grounds, 124 F.3d 508 (1997), an environmental-contamination case. Id. at 1289. That reliance is mistaken.
[8] See Sandoz, Inc. v. Employer's Liability Assur. Corp., 554 F.Supp. 257, 265 n. 2 (D.N.J. 1983); Voorhees, supra, 128 N.J. at 177-78, 607 A.2d 1255; Evers v. Dollinger, 95 N.J. 399, 405-06, 471 A.2d 405 (1984); Karol v. Berkow, 254 N.J.Super. 359, 367-69, 603 A.2d 547 (App.Div.1992).
[9] We note that Polarome mischaracterizes the holding in Lac d'Amiante when it quotes certain language from the opinion that in fact is nothing more than the court's summary of the argument made by the plaintiff.
[10] We have recently concluded that this statement "was dictum because it was not essential to the Court's decision." N.J. Mfrs. Ins. Co. v. Vizcaino, 392 N.J.Super. 366, 374, 920 A.2d 754 (App.Div.2007).