961 A.2d 1195 (2008)
404 N.J. Super. 363
SEALED AIR CORPORATION, Plaintiff-Respondent,
v.
ROYAL INDEMNITY COMPANY, as Successor in Interest to Royal Insurance Company of America, Defendant-Appellant.
DOCKET NO. A-5951-06T3.
Superior Court of New Jersey, Appellate Division.
Argued April 2, 2008.
Decided August 15, 2008.
*1197 William P. Krauss, Newark, argued the cause for appellant (Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, attorneys; Mr. Krauss, of counsel and on the brief).
Andrew T. Berry, Newark, argued the cause for respondent (McCarter & English, LLP, attorneys; Mr. Berry, of counsel and on the brief; Nicole Corona, on the brief).
Before Judges WEFING, R.B. COLEMAN and LYONS.
The opinion of the court was delivered by
LYONS, J.A.D.
This case examines whether a directors and officers (D & O) insurance policy affords coverage for defense costs and damages arising from a suit alleging misrepresentations regarding contingent liabilities for pollution claims made following a multi-step transaction to reorganize and merge businesses. The insurer, Royal Indemnity Company (Royal), denied coverage relying on the pollution exclusion provisions in its policy. Sealed Air Corporation (Sealed Air), the insured, sued and the trial court found coverage, concluding that the alleged pollution at issue was too attenuated from the damages arising from the alleged misrepresentations to trigger the pollution exclusion provision in the Royal policy. After consideration of the contentions advanced on appeal, we affirm the trial court.
The background leading up to this dispute is as follows. W.R. Grace & Co.'s (Old Grace) asbestos liability stemmed in large part from its 1963 acquisition of Zoolite Co., including its fireproofing business and related vermiculite mining operations in Libby, Montana, which it operated until 1990. Because of the contamination that resulted from the mining operations, Old Grace settled 177 property damage suits and claims for $241.8 million and 23,700 personal-injury suits for $109 million through the end of 1995. Old Grace was also held liable for $74.7 million in damages in seven property damage cases. During the fourth quarter of 1996, Old Grace took a $229 million pre-tax charge for asbestos litigation which resulted primarily from its estimate of the costs associated with asbestos personal injury claims to be filed against it during the five-year period from 1997 through 2001. In 1995, Old Grace had reserved for such expenses based on a three-year projection.
Through a series of transactions in 1998, Old Grace reorganized, spinning off its specialty chemical business and merging with Sealed Air, an independent corporation at that time. In March 1998, Old Grace, a holding company for an operating company called W.R. Grace & Co.-Conn. (Grace-Conn.), caused Grace-Conn. to transfer the assets of its packaging business to a newly formed subsidiary of Grace-Conn., called Cryovac, Inc. (Cryovac). The stock of Cryovac was then *1198 transferred to the direct ownership of Old Grace. The end result was that Old Grace, a holding company, held the two companies, Grace-Conn. and Cryovac, as subsidiaries.
Old Grace had also formed a new subsidiary in 1997, called Grace Specialty Chemicals (New Grace). Old Grace contributed the stock of Grace-Conn. to New Grace. In 1998, New Grace was spun off from the holding company, Old Grace, and became an independent company when Old Grace distributed New Grace's common stock on a pro rata basis to the holders of Old Grace's common stock. New Grace was renamed "W.R. Grace & Co." All of the liability for Old Grace's pollution was to remain with this entity.
Next, Old Grace was recapitalized by providing to each of its shareholders a fraction of a share of new common stock and a share of preferred stock for each outstanding share of Old Grace. In 1998, Sealed Air, an independent corporation, was then merged into a newly-created subsidiary of Old Grace, which was then renamed Sealed Air-U.S. Old Grace, which at that time owned Sealed Air-U.S. and Cryovac, was renamed "Sealed Air Corporation." The Sealed Air merger was completed by its shareholders receiving one share of the newly renamed Sealed Air Corporation (formerly Old Grace) stock. As a result of the merger, the former Old Grace shareholders held approximately sixty-three percent of the newly renamed Sealed Air capital stock.
Before the merger transaction was consummated, KPMG Peat Marwick LLC, Old Grace's independent auditor, analyzed and quantified the extent of its future potential asbestos bodily injury liabilities and determined that New Grace would remain solvent after the transaction. At a mid-August 1997 board meeting, KPMG's quantification report, along with reports of the Old Grace's CFO and an outside consultant, opined that New Grace would be solvent after the merger transaction.
The complaint in the underlying securities fraud litigation claims that Sealed Air's "plan to paper over the solvency/fraudulent transfer issue culminated" at this meeting with the presentation of the KPMG report. The CFO of Old Grace and an outside consultant, Houlihan, Lokey, Howard & Zukin, both relied on the report in rendering their opinions that New Grace would be solvent after the transaction. Sealed Air, at that time still an independent corporation, hired its own consultant, who, in turn, relied on the KPMG report. The KPMG report, the complaint alleges, was "rigged" by Old Grace. The complaint alleges that Old Grace went to seventeen different law firms with a history of filing asbestos-related claims, and "procured a moratoria on their filing of claims. Claims from those law firms dropped precipitously, almost to zero." Therefore, the underlying complaint alleges that KPMG's "quantification of the asbestos liabilities in the KPMG report was based on the apparent leveling off of the number of asbestos claims asserted against [Old Grace]."
The statements, therefore, that were made at the board meeting, and at a March 1998 special meeting of stockholders, were all allegedly tainted by the KPMG report. In addition, the complaint alleges that securities analysts, based on this information, wrote reports which were publicly available and entered the public marketplace. The complaint alleges that the plaintiffs in the underlying litigation, "in reliance on the integrity of the market,... paid artificially inflated prices for Seal Air publicly traded securities."
On March 27, 2000, after the merger and reorganization had been consummated, Sealed Air filed its 1999 Form 10-K *1199 with the Securities and Exchange Commission (SEC). The 1999 Form 10-K made the following disclosure with respect to Sealed Air's potential liability for the asbestos-related liabilities of New Grace:
In connection with the Merger, New Grace retained, and agreed to indemnify and defend the Company against, all liabilities of Grace, whether accruing or occurring before or after the Merger, other than liabilities arising from or relating to Cryovac's operations. As a result, New Grace is obligated to indemnify and defend the Company [Sealed Air] in a small number of actions raising asbestos-related claims in which the Company has been named as a defendant as the alleged successor to Grace because of the Merger. The Company believes that such claims are without merit as to the Company and intends to defend vigorously these actions. Based upon currently available information, the Company believes that future costs, if any, related to such actions and other indemnified liabilities will not have a material adverse effect on the Company's results of operations or consolidated financial position.
Subsequently, Sealed Air filed its 2000 Form 10-K on March 23, 2001, and its 2001 Form 10-K on March 27, 2002. Sealed Air also filed Forms 10-Q on May 12, 2000, August 11, 2000, November 13, 2000, May 31, 2001, August 10, 2001, November 13, 2001, and May 14, 2002. In addition, there were various press releases disseminated by Sealed Air from October 2000 to July 2002. The complaint alleges that these documents presented Sealed Air's financial results and statements in a manner which violated Generally Accepted Accounting Principles (GAAP). Furthermore, the complaint alleges that
the undisclosed adverse information concealed by defendants during the Class Period [March 27, 2000 to July 30, 2002] is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.
In April 2001, the number of new asbestos-related lawsuits filed against New Grace forced it to file for reorganization under Chapter 11 of the Bankruptcy Code. In May 2002, a committee of its creditors commenced an adversary action, alleging that the corporate reorganization transaction outlined above constituted a fraudulent conveyance. In July 2002, the federal court overseeing the bankruptcy proceedings held that New Grace's solvency at the time it was spun off from Old Grace should have been determined based upon its actual future liabilities on the date of its establishment, not the then reasonable estimates of potential future liabilities.
On the day of the federal judge's ruling, Sealed Air's stock dropped by forty-one percent. The following day, the price dropped again, off thirty-four percent from the previous day's close. The reason for the decline was that if the spin-off were found to have been a fraudulent transfer, Sealed Air might have to return the assets of Cryovac to the bankrupt estate or be found responsible for the asbestos liabilities of Old Grace and its subsidiaries. Sealed Air subsequently reached a settlement with the creditors' committee, paying it $850,000,000 in stock and cash. On the day that the settlement was announced, the Sealed Air stock rose fifty-six and one-half percent.
On September 19, 2003, the underlying securities case, a putative class action, was *1200 filed in the United States District Court, District of New Jersey against Sealed Air and its directors and officers. The claimants alleged that the directors and officers of Sealed Air caused its stock to trade at artificially inflated levels through the issuance of false and misleading statements, thereby injuring its stockholders. The complaint specifically alleges violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. 78j(b), and Rule 10b-5, 17 C.F.R. 240.10b-5, promulgated thereunder, as well as a violation of section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C.A. 78t(a). The pertinent portions of the complaint state:
208. During the Class Period [March 27, 2000 to July 30, 2002], defendants disseminated or approved the false statements specified above [concerning the liability of New Grace], which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.
. . . .
210. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Sealed Air publicly traded securities. Lead Plaintiff and the class would not have purchased Sealed Air publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.
211. As a direct and proximate result of these defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchase of Sealed Air publicly traded securities during the Class Period.
. . . .
213. The executive officers of Sealed Air prepared, or were responsible for preparing, the Company's press releases and SEC filings. The Individual Defendants controlled other employees of Sealed Air. Sealed Air controlled the Individual Defendants and each of its officers, executives and all of its employees. By reason of such conduct, defendants are liable pursuant to § 20(a) of the 1934 Act.
On June 23, 2003, Sealed Air notified its D & O insurer, Royal, of the litigation and requested coverage for Sealed Air's costs arising therefrom. The Royal policy provided coverage as follows:
A. Directors and Officers Liability Coverage
If Insuring Clause A coverage is purchased pursuant to Item 1 of the Declarations for this Coverage Part, the Insurer shall pay on behalf of the Insured Persons Loss resulting from Claims first made during the Policy Period against the Insured Persons for Wrongful Acts, except for Loss for which the Company grants indemnification to or on behalf of the Insured Persons.
. . . .
C. Company Securities Claim Liability Coverage
If Insuring Clause C coverage is purchased pursuant to Item 1 of the Declarations for this Coverage Part, the Insurer shall pay on behalf of the Company Loss resulting from Securities Claims first made during the Policy Period against Company for Wrongful Acts.
The Directors and Officers Liability Coverage Part Declarations indicates that *1201 Sealed Air purchased coverage for Clauses A, B, and C.
The policy also defines "Securities Claim":
H. Securities Claim means any Claim which, in whole or in part:
1. is based on, arises out of or in any way involves the purchase or sale of, or offer to purchase or sell, any equity or debt securities issued by the Company, whether such purchase, sale or offer involves a transaction with the Company or occurs in the open market, or
2. is brought by or on behalf of one or more securities holders of the Company in their capacity as such.
Royal denied coverage by letter dated March 2, 2005, claiming that "[t]he Policy contains a Pollution Exclusion that expressly precludes coverage for the Lawsuit." The Policy, as modified by the Amended Pollution Exclusion, provides:
A. Exclusions Applicable to All Insuring Clauses
The Insurer shall not be liable for Loss resulting from any Claim made against any Insured Person, or with respect to Insuring Clause C, the Company:
(6) based on, arising out of, or in any way involving:
(a) the actual, alleged or threatened discharge, release, escape, seepage, migration or disposal of Pollutants into or on real or personal property, water, or the atmosphere; or
(b) any direction or request that the Company or the Insured Persons test for, monitor, clean up, remove, contain, treat, detoxify or neutralize Pollutants, or any voluntary decision to do so:
including without limitation any Claim for financial loss to the Company, its security holders or its creditors based on, arising out of, or in any way involving the matters described in subparts (a) or (b) above
. . . .
On August 29, 2005, after further conversations and correspondence, Sealed Air filed a complaint against Royal seeking declaratory relief as to Royal's duty to indemnify Sealed Air and to advance defense costs to Sealed Air with respect to the underlying securities litigation. Sealed Air further asserted claims for damages alleging breach of the duty to indemnify and breach of the duty to advance defense costs. On November 4, 2005, Royal filed an Answer to the complaint and asserted affirmative defenses, including that the policy's pollution exclusion precluded coverage for the securities litigation.
On July 11, 2006, Sealed Air moved for summary judgment against Royal. On August 10, 2006, Royal responded to Sealed Air's motion for summary judgment and filed its own cross-motion for summary judgment. On September 8, 2006, Judge Katherine R. Dupuis heard arguments from the parties and granted summary judgment to Sealed Air, denying Royal's motion for summary judgment. Judge Dupuis determined that the policy's pollution exclusion did not bar coverage to Sealed Air for the securities litigation.
On May 22, 2007, following trial on May 21 and 22, 2007, Judge Dupuis signed a final order and judgment in favor of Sealed Air, requiring Royal to advance defense costs to Sealed Air for the securities litigation. Royal now appeals from that order and judgment.
In its appeal, appellant raised the following points for our consideration:
POINT I
ROYAL IS ENTITLED TO JUDGMENT DISMISSING ALL CLAIMS AGAINST IT AS A MATTER OF *1202 LAW. THE TRIAL COURT ERRED IN REFUSING TO APPLY THE PLAIN LANGUAGE OF THE POLLUTION EXCLUSION.
POINT II
THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO SEALED AIR BECAUSE THE POLLUTION EXCLUSION BARS COVERAGE FOR THE CLAIMS AGAINST THE INSUREDS FOR FINANCIAL LOSS TO SEALED AIR'S SECURITY HOLDERS ARISING OUT OF SEALED AIR'S ASBESTOS LIABILITY AND, THEREFORE, ROYAL HAS NO OBLIGATION TO ADVANCE DEFENSE COSTS.
In considering a summary judgment motion, the trial court must not "weigh the evidence and determine the truth of the matter"; it must only decide whether there is a genuine issue for trial. Brill v. Guardian Life Ins. Co., 142 N.J. 520, 540, 666 A.2d 146 (1995). Further, the trial judge must decide
whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party. This assessment of the evidence is to be conducted in the same manner as that required under Rule 4:37-2(b).
Because the case was disposed of in a summary judgment proceeding, our statement of the facts is based on our consideration of the evidence in the light most favorable to the parties opposing summary judgment.
[Id. at 523, 666 A.2d 146.]
On appeal, we use the same standards. We decide first whether there was a genuine issue of material fact. If there was not, we then decide whether the lower court's ruling on the law was correct. Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App.Div.1998) (citing Antheunisse v. Tiffany & Co., 229 N.J.Super. 399, 402, 551 A.2d 1006 (App.Div.1988), certif. denied, 115 N.J. 59, 556 A.2d 1206 (1989)). We "owe[] no deference to the trial court's interpretation of the law and the legal consequences that flow from established facts and, hence, [our] review of legal issues is de novo." Pressler, Current N.J. Court Rules, comment 3.1 on R. 2:10-2 (2007) (internal quotation omitted). As there are no factual disputes in this case, we, therefore, "address solely questions of law, and thus are not bound to defer to the legal conclusions of the lower courts." Lewis v. Harris, 188 N.J. 415, 431-32, 908 A.2d 196 (2006).
We note first that the complaint in the underlying litigation alleges violations of sections 10(b), 15 U.S.C.A. 78j(b), and 20(a), 15 U.S.C.A. 78t(a), of the 1934 Exchange Act, and Rule 10b-5, 17 C.F.R. 240.10b-5. Royal does not argue that the nature of plaintiff's complaint is not covered by its policy agreement. Rather, it asserts that the pollution exclusion clause excludes coverage.
Royal urges that the exclusion be given a literal reading, "preclud[ing] coverage for the claims alleged in the Securities Litigation because those claims are for financial losses to security holders based on, arising out of, or involving the actual, alleged, or threatened discharge, release, escape, seepage, migration, or disposal of asbestos and asbestos products." Royal argues that the pollution exclusion negates its obligation to otherwise provide coverage. Royal claims that "[t]he language and effect of the Policy's pollution exclusion is clear and unambiguous."
*1203 Royal distinguishes the Supreme Court's interpretation of the pollution exclusion in Nav-Its, Inc. v. Selective Ins. Co. (Nav-Its), 183 N.J. 110, 869 A.2d 929 (2005), stating that "[t]he Policy [in this case] is a D & O policy, not a CGL policy." It argues that the two different policies are intended to cover different categories of risk. The CGL policy at issue in Nav-Its, Royal argues, provides coverage for bodily injury and property damages, while "the D & O policy here does not cover and was never intended to cover claims for bodily injury damage and property damage. In fact, the Policy expressly excludes coverage for such claims." In Nav-Its, Royal argues, the exclusion was interpreted in light of a regulatory framework that is inapplicable to the current D & O policy at issue. Furthermore, Royal posits that subsequent case law holds that the "traditional environmental pollution" limitation articulated in Nav-Its applies only in the context of CGL policies.
Sealed Air counters that the alleged loss to the shareholders "arises out of allegedly misleading financial statements, not from air-borne asbestos." It argues that the pollution exclusion in the Royal policy does not apply to Sealed Air's securities litigation claim. Sealed Air interprets Nav-Its to apply to all pollution exclusion provisions in insurance policies, not just CGL policies. Because Sealed Air's alleged damages arose from securities misrepresentation and not traditional environmental pollution, it argues that the Royal policy provides coverage.
The interpretation of contracts and their construction are matters of law for the court subject to de novo review. Fastenberg v. Prudential Ins. Co. of Am., 309 N.J.Super. 415, 420, 707 A.2d 209 (App.Div.1998). "We recognize those well-settled principles governing the interpretation of contracts of insurance that mandate broad reading of coverage provisions, narrow reading of exclusionary provisions, resolution of ambiguities in the insured's favor, and construction consistent with the insured's reasonable expectations." Search EDP, Inc. v. Am. Home Assurance Co., 267 N.J.Super. 537, 542, 632 A.2d 286 (App.Div.1993), certif. denied, 135 N.J. 466, 640 A.2d 848 (1994); accord Nav-Its, supra, 183 N.J. at 119, 869 A.2d 929. However, "[w]hen the provisions of the text, read literally, would largely nullify the protections afforded by the policy, we restrict their meaning `so as to enable fair fulfillment of the stated policy objective.'" Auto Lenders Acceptance Corp. v. Gentilini Ford, Inc., 181 N.J. 245, 276, 854 A.2d 378 (2004) (quoting Kievit v. Loyal Protective Life Ins. Co., 34 N.J. 475, 483, 170 A.2d 22 (1961)). "`Consistent with that principle, courts also endeavor to interpret insurance contracts to accord with the objectively reasonable expectations of the insured.'" Nav-Its, supra, 183 N.J. at 118, 869 A.2d 929 (quoting Doto v. Russo, 140 N.J. 544, 555, 659 A.2d 1371 (1995)).
Recently, we recognized that "`an insurance policy should be interpreted according to its meaning. But because insurance policies are adhesion contracts, courts must assume a particularly vigilant role in ensuring their conformity to public policy and principles of fairness.'" Jolley v. Marquess, 393 N.J.Super. 255, 268, 923 A.2d 264 (App.Div.2007) (quoting Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 175, 607 A.2d 1255 (1992)). Furthermore, while "courts should construe insurance policies in favor of the insured, they 'should not write for the insured a better policy of insurance than the one purchased.'" Longobardi v. Chubb Ins. Co., 121 N.J. 530, 537, 582 A.2d 1257 (1990) (quoting Walker Rogge, Inc. v. Chelsea Title & Guar. Co., 116 N.J. 517, 529, 562 A.2d 208 (1989)). Nonetheless, "exclusionary *1204 clauses, drawn for the company by [those] learned in the law of insurance are to be strictly construed against the insurer; that the insured is entitled to protection to the full extent that any reasonable interpretation of them will permit." S.N. Golden Estates, Inc. v. Cont'l Cas. Co., 293 N.J.Super. 395, 401, 680 A.2d 1114 (App. Div.1996) (quoting Ruvolo v. Am. Cas. Co., 39 N.J. 490, 498, 189 A.2d 204 (1963)).
Here, the underlying litigation arose from allegedly false and misleading representations and omissions pertaining to whether Sealed Air properly evaluated certain contingent liabilities regarding potential pollution liability claims which were to remain with a subsidiary to be spun off. Reading the complaint in this case, it is clear to us that the gravamen of the securities holders' complaint has its root in securities fraud and misrepresentation, not pollution.
In New Jersey, "`the duty to defend comes into being when the complaint states a claim constituting a risk insured against.'" Voorhees, supra, 128 N.J. at 173, 607 A.2d 1255 (quoting Danek v. Hommer, 28 N.J.Super. 68, 77, 100 A.2d 198 (App.Div.1953), aff'd o.b., 15 N.J. 573, 105 A.2d 677 (1954)). "Whether an insurer has a duty to defend is determined by comparing the allegations in the complaint with the language of the policy. When the two correspond, the duty to defend arises, irrespective of the claim's actual merit." Voorhees, supra, 128 N.J. at 173, 607 A.2d 1255.
The complaint alleges that the directors and officers
disseminated or approved the false statements specified above [concerning the liability of New Grace], which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.
Therefore, the complaint continues, the securities holders suffered damages in reliance on these statements. The complaint states that the "executive officers of Sealed Air prepared, or were responsible for preparing, the Company's press releases and SEC filings" and are "liable pursuant to § 20(a) of the 1934 Act." The policy provides coverage for claims relating to a "purchase, sale or offer involv[ing] a transaction with the Company or occur[ring] in the open market" or a claim "brought by or on behalf of one or more securities holders." As the gravamen claim of the complaint is clearly contemplated by the policy, the issue here is whether the pollution exclusion allows Royal to disclaim coverage.
Both parties argue that Nav-Its supports their respective positions. Royal argues that the "traditional environmental pollution" limitation in Nav-Its applies only in the context of CGL policies, while Sealed Air applies Nav-Its to all pollution exclusions in all policies involving "traditional environmental pollution." A literal reading, if unfair and contrary to the reasonable expectations of the insured, should be rejected in favor of an interpretation finding coverage in a case involving similar language. Cf. Nav-Its, supra, 183 N.J. at 123-24, 869 A.2d 929. The Court in Nav-Its dealt with a pollution exclusion in a CGL policy subject to an insurance regulatory framework where representations were made by insurance companies regarding CGL policies and particularly the pollution exclusion contained therein. Supra, 183 N.J. at 126, 869 A.2d 929. Because the Court "conclude[d] that the pollution exclusion clause [in CGL policies] as presently approved should be limited to *1205 traditional environmental pollution, we disapprove of any contrary view expressed in our case law." Ibid. While the parties dispute whether Nav-Its is limited to CGL policies, we do not need to reach whether Nav-Its extends to D & O insurance because we find that the language of the policy at issue precludes Royal from disclaiming based upon its pollution exclusion.
Examining the history of the multi-step transaction, Sealed Air's subsequent securities disclosures, and the explicitly stated cause of action that triggered Sealed Air's claim under its D & O policy, we find that the pollution relied on by Royal to exclude coverage is too attenuated from the damages sought and the legal grounds supporting such alleged damages claimed in the complaint in the underlying litigation. The factual background concerning this securities claim demonstrates the extent of the attenuation between Old Grace's alleged acts of pollution and the underlying plaintiffs' securities claim. Old Grace accrued certain contingent liabilities due to alleged pollution occurring more than ten years prior to the securities litigation. In August 1997, an independent auditor allegedly inadequately quantified and evaluated the amount of contingent liabilities to be assumed by New Grace. It is alleged that Old Grace procured a moratorium on filing new actions with seventeen firms who historically had filed asbestos-related litigation on behalf of plaintiffs. The moratorium colored the auditor's report. Disclosures were made in connection with shareholders' approvals regarding New Grace's solvency following the transaction. The complex, multi-step merger was then effectuated.
It then developed that New Grace allegedly inadequately provided for its contingent asbestos and environmental liabilities. Sealed Air's directors and officers made representations in SEC filings and press releases, following the merger, that Sealed Air would not incur any of the pollution liabilities. As a result of new asbestos-related lawsuits, New Grace was forced to reorganize under Chapter 11 of the Bankruptcy Code. A creditors' committee filed a claim alleging that the asbestos-related contingent liabilities were inadequately quantified, resulting in a fraudulent transfer. Subsequently, there was a federal court ruling that found that "[t]ransactions... must take the reality of the companies' existing liability and the inherent difficulty in defining that liability's scope into consideration." In re W.R. Grace & Co., 281 B.R. 852, 869 (Bankr.D.Del.2002). Therefore, the court found that claims filed after the spin-off of New Grace could be considered in determining its solvency. As a result of the federal court's ruling, Sealed Air's assets were potentially threatened, and the value of Sealed Air's stock dropped precipitously. Shareholders of publicly-purchased Sealed Air securities brought a class action against Sealed Air for the alleged misrepresentations by its directors and officers. As a result of this law suit, Sealed Air filed its claim against Royal seeking coverage under its D & O insurance. The damages sought here are compensation as a result of the decline in the stock's value, which is undisputedly claimed to be a result of the alleged misleading statements.
Turning to the policy language, the pollution exclusion precludes coverage for incidents "based on, arising out of, or in any way involving" pollution.
"Base" is defined as "[t]he fundamental principle or underlying concept of a system or theory; a basis." The American Heritage Dictionary (4th Ed. 2006). Here, the basis of the damages, or the theory by which the damages were incurred, was the securities litigation. The alleged pollution, in and of itself, did not *1206 give rise to the damages alleged here. Without the numerous intervening events and, ultimately, the securities fraud litigation, there would be no damages which could be alleged by the securities holders and, thus, no claim. Accordingly, the claim was "based on" the securities fraud litigation, not pollution.
Quoting Am. Motorists Ins. Co. v. L-C-A Sales Co., 155 N.J. 29, 36, 713 A.2d 1007 (1998), Royal argues, "[w]hen used in an exclusion, the term `arising out of is broadly defined to mean `originating from, growing out of or having a substantial nexus.'" However, a genuine ambiguity arises where the phrasing of the policy fails to specifically define the boundaries of coverage. Lee v. General Acc. Ins. Co., 337 N.J.Super. 509, 513, 767 A.2d 985 (App.Div.2001). "In that instance, the policy should be construed to comport with the insured's objectively reasonable expectations of coverage." Ibid. Here, the claim arose from damages allegedly suffered as a result of a securities litigation claim. It is reasonable for Sealed Air to expect that the Royal policy would cover these claims given that Clause C of the D & O Policy specifically covers securities claims such as those alleged here. In addition, as discussed above, there are too many intervening events to reasonably find a required "substantial nexus" between the pollution and the alleged securities holders' damages. Am. Motorists Ins. Co., supra, 155 N.J. at 35, 713 A.2d 1007. Given the ambiguity resulting from the "arising out of" language when used without boundaries, and the insured's reasonable expectation to be covered for securities claims such as those present here, we do not construe the phrase "arising out of" in the pollution exclusion to preclude coverage of this claim.
Lastly, "in any way involving" is facially extremely inclusive. However, in interpreting these words in the policy, we apply the maxim of noscitur a sociis. See Mortgage Corp. of N.J. v. Aetna Cas. & Sur. Co., 19 N.J. 30, 50, 115 A.2d 43 (1955). "Simply stated, this means that a word is known from its associates. Words of general and specific import take color from each other when associated together, and thus the word of general significance is modified by its associates of restricted sense." Bertrand v. Jones, 58 N.J.Super. 273, 283, 156 A.2d 161 (App. Div.1959), certif. denied, 31 N.J. 553, 158 A.2d 452 (1960). Read together with the surrounding words, "based on" and "arising out of," in the context of the pollution exclusion clause, "in any way involving" requires a more direct causal relationship between the pollution and the harm. Royal's interpretation of the pollution exclusion is too broad, unfair, and contrary to the reasonable expectations of the insured. See Nav-Its, supra, 183 N.J. at 123, 869 A.2d 929; Lee, supra, 337 N.J.Super. at 513, 767 A.2d 985. Here, the relationship is far too attenuated to trigger the exclusion. Therefore, we find "in any way involving" is colored and limited by "based on" and "arising out of" to include only events that are not unreasonably attenuated from pollution.
Royal attempts to argue that applying the pollution exclusion to only "traditional environmental pollution" "would be contrary to the overall scope of the Policy and would render the pollution exclusion superfluous and useless." This is simply inaccurate. Clearly, it is reasonable to interpret the environmental pollution provision to allow the insurer to disclaim coverage where a company's directors or officers were sued for polluting. Nav-Its, supra, 183 N.J. at 121, 869 A.2d 929. If insurers seek to exclude misrepresentations in securities cases that have some *1207 remote connection with pollution, however, the policy language must be changed.
In summary, the complaint clearly arises from alleged violations of the Securities Exchange Act of 1934 and the rules promulgated therefrom, not from intentional pollution. Because we find that the plain and ordinary language of the policy, as well as the reasonable expectations of the insured, prevents Royal from disclaiming coverage based upon the pollution exclusion, we need not reach whether or not the "traditional environmental pollution" limitation in Nav-Its extends to D & O insurance policies. Accordingly, the trial court's decision is affirmed.
Affirmed.