NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.   A-5415-15T3

AIR MASTER & COOLING, INC.,

    Plaintiff-Appellant,

v.

SELECTIVE INSURANCE COMPANY
OF AMERICA,

    Defendant-Respondent,

and

HARLEYSVILLE INSURANCE COMPANY,

    Defendant.

_____

> **APPROVED FOR PUBLICATION**
>
> **October 10, 2017**
>
> **APPELLATE DIVISION**

Argued September 25, 2017 — Decided October 10, 2017

Before Judges Sabatino, Whipple and Rose.

On appeal from Superior Court of New Jersey,
Law Division, Essex County, Docket No. L-6861-
14.

Sharon K. Galpern argued the cause for
appellant (Stahl & DeLaurentis, PC, attorneys;
Ms. Galpern, on the briefs).

Todd J. Leon argued the cause for respondent
(Hill Wallack, LLP, attorneys; Mr. Leon, of
counsel and on the brief; Victoria J. Airgood,
on the brief).

The opinion of the court was delivered by

SABATINO, P.J.A.D.

This declaratory judgment action poses several fundamental legal issues concerning property damage coverage under a Commercial General Liability ("CGL") insurance policy. The coverage issues arise out of lawsuits brought by a condominium association and unit owners to remediate construction defects within a residential building. The insured, Air Master & Cooling, Inc. ("Air Master"), had performed work as a subcontractor on the roof and elsewhere in the building. The construction defects concern property damage resulting from, among other things, the apparent progressive infiltration of water within the building.

After Air Master was named as a third-party defendant in the underlying construction defects cases, it sought a defense and indemnity from Selective Insurance Company of America ("Selective"). Selective was one of a series of different insurers that had issued CGL policies to Air Master over successive policy periods.

The trial court granted summary judgment to Selective in the declaratory judgment action, agreeing with the insurer that the property damage to the building already had manifested before Selective's policy period commenced. In appealing from that ruling, Air Master raises several legal issues, some of which are either completely novel or which have not been definitively addressed under New Jersey law.

2

For the reasons explained in this opinion, we hold, first, that a "continuous trigger" theory of insurance coverage may be applied in this State to third-party liability claims involving progressive damage to property caused by an insured's allegedly defective construction work. Second, we hold that the "last pull" of that trigger — for purposes of ascertaining the temporal end point of a covered occurrence — happens when the essential nature and scope of the property damage first becomes known, or when one would have sufficient reason to know of it. Third, we reject Air Master's novel argument that the last pull of the trigger does not occur until there is expert or other proof that "attributes" the property damage to faulty conduct by the insured.

Applying these principles, we vacate summary judgment and remand for further development of the record and for reconsideration of the coverage issues. We do so because the present factual record is insufficient to determine with clarity when the essential nature and scope of the water infiltration damage was sufficiently known, or reasonably could have been known, as to, respectively, (1) the individual condo units and (2) the roof. In making that assessment with an enhanced factual record, the trial court shall be particularly guided by the manifestation analysis set forth in <u>Winding Hills Condominium Association, Inc.</u>

3

v. North American Specialty Insurance Co., 332 N.J. Super. 85, 88–93 (App. Div. 2000).

## I.

The limited record provided on appeal presents the following relevant chronology. The insured, Air Master, worked as a subcontractor on the construction of a seven-story, 101-unit, mostly-residential condominium building in Montclair. The construction manager hired Air Master to perform HVAC[1] work in the building, which Air Master conducted between November 2005 and April 2008. As described in the record, Air Master's work consisted of installing condenser units on rails on the building's roof, and also HVAC devices within each individual unit.

Starting in early 2008, some of the unit owners began to notice water infiltration and damage in their windows, ceilings, and other portions of their individual units. According to a November 4, 2010 story published in a local newspaper, unit owner Carlton Schultz, a fifth-floor resident, noticed by February 2008 the presence of leaks in his walls and windows. In addition, the story reported that another resident on the same floor, Raniya Kassem, noticed similar damage to her unit by July 2008. The newspaper story indicated that "[w]orkers eventually began to

---

[1] HVAC commonly refers to heating, ventilation, and air conditioning. See, e.g., State v. Perini Corp., 221 N.J. 412, 419 (2015).

suspect that some of the leaks resulted from improper drainage from the balcony above Kassem's condo," and the workers "tried making some adjustments to that balcony to halt that flow." The article further reported that leaks had been discovered in common area stairwells and the building's parking garage. The project's general contractor and developer began to respond to the problems, and certain investigations and remedial measures were commenced.

Eventually, on April 29, 2010, an expert consultant, Jersey Infrared Consultants ("Jersey Infrared"), performed a moisture survey of the roof for water damage, as documented in a May 3, 2010 report. The report identified 111 spots on the roof damaged by moisture from water infiltration. The expert recommended that these damaged areas of the roof be removed and replaced.

With respect to the timing of these conditions, the Jersey Infrared report stated that "it is impossible to determine when moisture infiltration occurred." The report raised a potential link of the water infiltration that the consultant had discovered on the roof to the previously-detected water problems on the floors below, noting that "[t]he absence of leaks in some areas [of the roof] may be due to the travel of moisture on the deck to another location where it could leak into the building."

Schultz, Kassem, and the condominium association each sued the project's developer and other defendants for property damage

and the costs of remediation. The three lawsuits were consolidated. The defendants, in turn, brought third-party complaints against Air Master and multiple other subcontractors that had worked on the project. Air Master then sought defense and indemnity from its various insurers that covered it under a succession of CGL policies.

In particular, Air Master was insured by Penn National Insurance Company ("Penn National") for the policy period from June 22, 2004 (or 2005)[2] through June 22, 2009. Air Master thereafter had a policy with Selective covering June 22, 2009 through June 22, 2012. Finally, Air Master had a policy from Harleysville Insurance Company ("Harleysville") covering June 22, 2012 through June 22, 2015.

Both Selective and Harleysville disclaimed coverage, denying that they had any duty to defend or indemnify Air Master against the property damages claims. They argued that the property damage had already manifested before their respective policy periods began.

Penn National, which insured Air Master during the November 2005 to April 2008 time frame when it performed the work on the

---

[2] The documentation in the record is inconsistent as to the start year of Penn National's coverage. In any event, the analysis of Selective's potential coverage is not affected by whether Penn National's policy began in 2004 or 2005.

A-5415-15T3

building, assumed the defense of the third-party complaints, subject to a reservation of its rights. Meanwhile, Harleysville moved for and obtained summary judgment because its policy did not commence until June 2012, long after the leaks had materialized.[3] That left open the coverage issues with respect to the middle carrier in the time sequence, Selective.

Selective's CGL policy states, in relevant part, that the insurer is to provide coverage for bodily injury or property damage that occurs "during the policy period." In addition, the policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Further, the policy defines "property damage" as "physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it." Property damage also is defined to encompass "loss of use of tangible property that is not physically injured." Similarly, "[a]ll such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it."

Air Master filed this declaratory judgment action against Selective and Harleysville in the Law Division in September 2014.

---

[3] That ruling as to Harleysville, which was made by a different Law Division judge, is not being appealed by Air Master.

7

After limited discovery, including apparently interrogatory responses and document exchanges, Selective moved for summary judgment.

Selective argued that it is not responsible for water damage that had materialized or manifested before the beginning of its coverage period in June 2009. In opposition, Air Master countered that under a continuous-trigger theory, coverage by all applicable insurers continues until the "last pull" of the trigger of an injury occurs. According to Air Master, manifestation does not happen until it becomes known, or reasonably knowable, that such damage is "attributable" to the work of the insured. Based on those assertions, Air Master argued that, at the very earliest, the last "pull" of the coverage trigger here was in May 2010, when Jersey Infrared issued its roof moisture report.

In her initial written decision dated June 10, 2016, the motion judge granted summary judgment to Selective on the ground that the continuous-trigger theory of coverage does not apply in New Jersey to first-party claims. See Winding Hills, supra, 332 N.J. Super. at 90-93 (articulating this distinction between first-party and third-party claims). Air Master moved for reconsideration. It persuaded the motion judge to change her mind and recognize that the present litigation involves, in fact, third-party liability claims against Air Master and thus the continuous-

8

trigger doctrine does apply. The motion judge corrected herself on this discrete point in her August 5, 2016 written decision on reconsideration.

Nonetheless, the motion judge still ruled that Selective is not liable for coverage or a duty to defend Air Master in this case, because she conclusively found that the damage to the building had manifested before Selective's policy period began in June 2009. The judge rejected Air Master's argument that the CGL coverage period continues until damages "attributable" to the insured have been discovered, or reasonably could have been discovered. As the judge noted in her written decision, "[t]here is no indication in the [Selective] Policy or in the case law that manifestation requires a separate analysis [of attribution] for each potentially liable insured." Discerning no questions of material fact were present, the judge added that "[i]t is not <u>meaningfully</u> contested that damage manifested at [the condo building] prior to Air Master's policy with Selective," and, hence, "Selective owes no duty to Air Master." (Emphasis added).

This appeal ensued.

## II.

### A.

Air Master argues this court should recognize, as a predicate matter, that continuous-trigger principles should govern third-

9

party liability coverage analysis in construction defect cases that involve progressive property damage, such as water infiltration. Next, Air Master contends that continuous-trigger principles extend coverage to all insurance policies in effect from the time of the insured's work on the construction project through the time by which it was known, or there was sufficient reason to know, that the manifested property damage was attributable to the insured's work.

Based on these predicates, Air Master contends that summary judgment in this case should be reversed because it was not until May 2010, when Jersey Infrared's roof study was issued, that property damage attributable to Air Master's work on the roof was first ascertained.

Air Master contends that it is not subject to an earlier manifestation date tied to the discovery of the leaks in the condo units below the roof, because it allegedly "had no involvement with windows, walls, or balconies which are the 2008 damage areas."

In considering these arguments, "we review the trial court's grant of summary judgment de novo under the same standard as the trial court." Templo Fuente De Vida Corp. v. Nat'l Union Fire Co. of Pittsburgh, 224 N.J. 189, 199 (2016). That familiar summary judgment standard is whether the record, viewed in a light most favorable to the non-moving party, shows that "there is no genuine

issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." Ibid. (quoting R. 4:46-2(c)); see also Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995). Moreover, in insurance coverage cases, "[t]he interpretation of contracts and their construction are matters of law for the court subject to de novo review." Duddy v. Gov't Emps. Ins. Co., 421 N.J. Super. 214, 217-18 (App. Div. 2011) (citing Sealed Air Corp. v. Royal Indem. Co., 404 N.J. Super. 363, 375 (App. Div.), certif. denied, 196 N.J. 601 (2008)).

Ordinarily, in construing the meaning of insurance policies, courts look to the literal terms of the policies, and enforce those terms if they are plain and unambiguous. Templo Fuente, supra, 224 N.J. at 200. However, in the context of CGL coverage, our Supreme Court has considered public policy factors when construing and applying such contractual provisions, including, as here, language that defines covered occurrences as losses that transpire "during" a policy period.

In the seminal case of Owens-Illinois, Inc. v. United Insurance Co., 138 N.J. 437, 454-56 (1994), the Supreme Court adopted the continuous-trigger theory for property damage insurance claims that arose from the installation of asbestos-related products. As Justice O'Hern's opinion in Owens-Illinois explained, the most frequently offered theories defining a

11

"trigger" of coverage recognized in other jurisdictions are: (1) the "exposure" theory; (2) the "manifestation" theory; and (3) the "continuous-trigger" theory.  Id. at 449-50.[4]

The exposure theory deems the trigger date of an occurrence that causes bodily injury to be "the date on which the injury-producing agent first contacts the body."  Id. at 450 (quoting Developments in the Law — Toxic Waste Litigation, 99 Harv. L. Rev. 1458, 1579-81 (1986)).  Alternatively, the manifestation theory entails ascertaining the point in time when an injury or disease first presented or manifested itself.  Ibid.  Lastly, the continuous-trigger theory recognizes that, because certain harms such as asbestos-related diseases will progressively develop over time, "the date of the occurrence should be the continuous period from exposure to manifestation."  Ibid.  Under such a continuous-trigger approach, "all the insurers over that period [are] liable for the continuous development of the disease."  Id. at 450-51.

---

[4] The Court also mentioned "two other less-frequently followed theories[:]" (1) the injury-in-fact or damage-in-fact approach, which holds that the time of the "actual injury or damage producing event" triggers coverage, and (2) the "double-trigger" theory, which holds that "injury occurs at the time of exposure and the time of manifestation, but not necessarily during the intervening period."  Id. at 451.  We need not discuss these alternatives here, in light of the continuous-trigger theory adopted by the Court in Owen-Illinois for the progressive injury claims in question.  Id. at 458-59.

12

The Court in <u>Owens-Illinois</u> endorsed the application of the continuous-trigger coverage doctrine in the specific context of asbestos-disease coverage cases, largely because that approach has the effect of maximizing coverage. <u>Id.</u> at 458-59. Unlike the manifestation theory, the continuous-trigger approach requires multiple successive insurers up to the point of manifestation to cover a loss. <u>Id.</u> at 451. Hence, more aggregate coverage is available to pay meritorious claims. The continuous-trigger approach also encourages insurers to monitor progressively-developing risks and to charge appropriate premiums for those risks. <u>Ibid.</u>

Analytically, the continuous-trigger theory shares the same coverage endpoint as the manifestation theory, i.e., the date when the harm has sufficiently become apparent to trigger a covered occurrence. The difference between the two approaches is that the manifestation theory confines coverage to the CGL insurer that happens to be on the risk at the time when the manifestation occurs, whereas the continuous-trigger theory will aggregate coverage from all insurers that were on the risk from the date of first exposure through the manifestation date.

Here, for example, if the property damage started during Penn National's policy period, but progressively advanced or worsened through Selective's policy period up to the time of

13

"manifestation," then both Penn National and Selective would be liable to provide a defense and coverage to Air Master, subject to potential allocation or apportionment between the carriers.

Although the use of the continuous-trigger doctrine is most readily justified in the context of progressive bodily injury, the Court in Owens-Illinois noted that the doctrine also can sensibly be applied to property damage that progresses after the time of initial exposure. "Like a person exposed to toxic elements, the environment does not necessarily display the harmful effects until long after the initial exposure." Id. at 455. For that reason, the Court held in Owens-Illinois that "claims of asbestos-related property damage from installation through discovery or remediation (the injurious process) trigger the policies on the risk throughout that period." Id. at 456 (emphasis added).

Since 1994 when Owens-Illinois was decided, case law has extended the continuous-trigger theory beyond the asbestos context to other progressive forms of third-party injuries. These include, for example, environmental contamination cases; see, e.g., Carter-Wallace v. Admiral Ins. Co., 154 N.J. 312, 321 (1998), and Quincy Ins. Co. v. Borough of Bellmawr, 172 N.J. 409, 411-12 (2002); and cases involving harmful exposure to substances, such as food flavorings containing the toxic chemical diacetyl; see, e.g.,

14

<u>Polarome Int'l, Inc. v. Greenwich Ins. Co.</u>, 404 <u>N.J. Super.</u> 241, 260-63 (App. Div. 2008), <u>certif. denied</u>, 199 <u>N.J.</u> 133 (2009).

Notably, the Court in <u>Owens-Illinois</u> declined to articulate what exactly is the "end" point, or the "last pull" of the coverage trigger, for a progressively-developing injury. <u>Owens-Illinois</u>, <u>supra</u>, 138 <u>N.J.</u> at 456. That question was later answered, however, by this court in <u>Polarome</u>, <u>supra</u>, 404 <u>N.J. Super.</u> at 266-69.

The insured in <u>Polarome</u>, a product manufacturer, sought CGL coverage after it had been named as a defendant in multiple lawsuits alleging serious progressive bodily injury as to persons who had inhaled diacetyl, a chemical used as a flavoring in the company's product. <u>Id.</u> at 250. One such claimant, Kuttner, had been exposed to diacetyl at his workplace through 1991, and the other claimant, Blaylock, had been exposed through 2001. <u>Id.</u> at 256. Both claimants' exposure at work ended before the insurers' policies came into effect. <u>Ibid.</u>

Applying a continuous-trigger theory, we concluded in <u>Polarome</u> that the "last pull" of the coverage trigger did not occur for the claimants' progressive, indivisible injuries until the point of "the initial manifestation of [their] toxin-related disease." <u>Id.</u> at 272. For claimant Kuttner, that manifestation occurred by October 1993, by which point he had been diagnosed with obstructive lung disease and his bodily injury had thus become

15

manifest.  Id. at 257.  For Blaylock, the "last pull" was deemed to be manifest by March 2002, when he reasonably could have been clinically diagnosed for bronchiolitis obliterans, following a lung biopsy that had been performed the previous month.  Ibid.

Summarizing the key timing principles in Polarome, we stated that "the last pull of the trigger occurs with the initial manifestation of a toxic-tort personal injury."  Id. at 268.  "It is only the undetectable injuries at and after exposure and prior to initial manifestation that are progressive and indivisible[,] such that the occurrence of an injury cannot be known."  Ibid.

None of the reported decisions in our state to date have specifically addressed the key issues presented here, which involve the appropriate manner for identifying the date of manifestation of property damage that progressively advances within a multi-unit building for purposes of third-party liability claims under a CGL policy.

### B.

Having stated this overall analytical framework, we turn first to the threshold question of whether a continuous-trigger theory of CGL coverage sensibly applies to claims for third-party, progressive property damage in construction defect cases.  We conclude that it does.  Indeed, the motion judge correctly presumed as much in her decision on reconsideration.

16

As we have already noted, our Supreme Court has endorsed the continuous-trigger doctrine in certain factual contexts for reasons of public policy, by treating all insurance policies in effect during the aggregate trigger period to be "activated and . . . be called on to respond to a loss." Quincy, supra, 172 N.J. at 417. The doctrine was fashioned to address the difficulties of establishing with scientific certainty when the harmful effects of a progressive disease or injury have occurred. Winding Hills, supra, 332 N.J. Super. at 90-91. The doctrine promotes the availability to the general public of coverage in such progressive injury situations. Id. at 91.

As an equitable matter, the continuous-trigger doctrine is not fundamentally unfair to insurers that were on the risk during policy periods as an injury progressed to the point of ultimate manifestation. Such insurers simply would be bearing a portion of the aggregate coverage burden that had accumulated while the yet-to-be-manifested harm worsened.

In at least one case, the Supreme Court implicitly approved the use of continuous-trigger coverage principles in a construction defect context. See Potomac Ins. Co. v. PMA Ins. Co., 215 N.J. 409, 422 (2013). There, the Court was presented with the question of whether an insurer may assert, against a co-insurer, a claim for costs incurred in defending litigation over

17

construction defects in a school roof. The property damage to the roof had manifested over a period of years, during which time the insured was insured by successive carriers. Id. at 413-15. Relying on its prior opinions in Owens-Illinois, supra, 138 N.J. at 478-80, and Carter-Wallace, supra, 154 N.J. at 317, the Court found that a continuous-trigger analysis in that particular setting was appropriate. Id. at 425. In doing so, the Court observed that the Owens-Illinois methodology had been applied to "a variety" of disputes between policyholders and insurers. Ibid.

Although Potomac Insurance specifically concerned the allocation of past defense costs incurred in a construction case by a common policyholder of several insurers, we discern no principled reason to refrain from applying continuous-trigger principles to cases like the present one, where issues of both past and future defense costs and indemnification are implicated. The public policies favoring a continuous-trigger approach in progressive injury matters are likewise germane here. Property damage within a building can be latent and undetected, behind walls and above ceiling tiles, and can gradually worsen and advance over time. Indeed, as the Supreme Court very recently observed, albeit in a somewhat different context, in The Palisades at Fort Lee Condominium Association, Inc. v. 100 Old Palisade, LLC, __ N.J. __, __ (2017) (slip op. at 34), "[m]any construction defects

18

will not be obvious immediately."  The progressively-worsening nature of a variety of construction defects, such as water infiltration or mold, logically support the application of the continuous-trigger doctrine.  We thus endorse the doctrine's use in this context.[5]

C.

We next consider Air Master's novel conceptual argument that the end date for a continuous trigger should be delayed until it first appears, or reasonably could be known, that the damage is "attributable" to the conduct of the specific insured.  Air Master contends that such an attribution requirement is consistent with the public policies underlying the continuous-trigger doctrine. It asserts that adding such a requirement would have the coverage-maximizing impact of extending the aggregate period of coverage to the point in time when a manifested injury could be reasonably linked to the particular conduct of an insured.

We agree that the trial court sensibly rejected this attribution argument, for several reasons.  First, we note that Air Master does not cite to any published opinions — nor could we

---

[5] In any event, as we shall discuss in Part II (C) and (D), infra, even if a "manifestation trigger" approach is followed here instead of a continuous-trigger approach, the same pivotal questions concerning the trigger "end date" need to be resolved for this case.

19

find one — in which courts have engrafted such an attribution element upon continuous-trigger analysis.[6]

Second, we concur with the trial court and Selective that it would be unwise to delay the coverage trigger date to a date by which there is sufficient information to link an insured's faulty conduct to the progressive injury. Such an attribution analysis could be highly fact-dependent, and difficult to resolve when an insured makes a request for defense and indemnification after being named in a complaint. The attribution analysis would require a defendant-specific determination of when each defendant reasonably could have been deemed to be at fault in contributing to the progressive harm. Those sorts of defendant-specific inquires could easily spawn lengthy and expensive collateral discovery and motion practice. Indeed, in this very case, more than two dozen subcontractors were named as third-party defendants, and it would be a colossal undertaking to conduct a defendant-by-defendant analysis of when the property damage first

---

[6] The two unpublished opinions cited by Air Master in support of recognizing an attribution element are not binding authority. See R. 1:36-3. In any event, those opinions are not particularly helpful to Air Master because the court concluded in both cases that coverage was inapplicable, since the property damage had been attributed to the insured before the insurance company's policy period had begun. Hence, in both unpublished cases cited by Air Master, the date of initial manifestation — which the trial judge here found and we agree is the correct "last pull" date — obviously preceded the date of attribution.

became attributable to each of them. By contrast, using a date of initial manifestation that is common to all parties — regardless of which contractor or subcontractor may be "at fault" for the occurrence — promotes efficiency and certainty.

In effect, Air Master is attempting, by analogy, to import to this present coverage realm the "equitable tolling" doctrine developed for and applied in the statute-of-limitations context. Under such equitable tolling principles (also known as the "discovery rule"), injured plaintiffs may be granted additional time to file suit until the point in time that they have reason (1) to know they are injured and (2) to attribute that injury to the fault of a particular defendant. See, e.g., Lopez v. Swyer, 62 N.J. 267 (1973).

This analogy fails, however, because the policy considerations that justify the equitable tolling of statutes of limitations for plaintiffs do not pertain to insured defendants who have potentially caused a progressive injury. Plaintiffs who have sustained such injuries often lack fault of their own. They also typically have less access to information than do defendants to identify the causes of the inflicted harm.

Statutes of limitations do not need to be coterminous with insurance coverage periods. Indeed, it is not uncommon, when equitable tolling is applied, for a plaintiff to file suit years

21

after an injury had manifested, if the plaintiff had no reason to know until that later point in time what party(ies) were responsible for that harm.  See, e.g., <u>Kendall v. Hoffman-La Roche, Inc.</u>, 209 <u>N.J.</u> 173, 185-86 (2012) (applying tolling to allow a plaintiff who allegedly had been injured by the effects of taking a drug to extend her time to file suit by approximately four years).

It would be unfair and inappropriate to use statute-of-limitations equitable tolling concepts to impose coverage and defense obligations upon insurers that issued "occurrence-based" policies years after an injury had clearly been manifested. Adopting such an approach would likely escalate premiums, or, even worse, deter insurers from writing such new CGL policies altogether, lest they be entangled in covering losses that had manifested long ago.  We decline to adopt a novel theory that would, in effect, transform CGL occurrence-based policies into instruments that would be more akin, if not identical, to "claims-made" policies.[7]  The latter are based upon entirely different underwriting considerations.

---

[7] <u>See</u> <u>Zuckerman v. National Union Fire Ins. Co.</u>, 100 <u>N.J.</u> 304, 310-11 (1985) (explaining the difference between an "occurrence" liability insurance policy, in which coverage applies to negligent or omitted acts happening during the policy period even if the claim is not presented until sometime later, and a "claims made" policy, in which coverage applies if the negligent or omitted act is discovered and brought to the insurer's attention during the

22

Hence, we reject Air Master's attribution theory as unsound and unsupported in the law.

D.

We now address the most pivotal aspect of this appeal, namely the determination of when the property damage due to water infiltration in the condominium building had first sufficiently "manifested" to comprise the "last pull" of the coverage trigger. In approaching this issue, we are guided by the illustrative analysis of Judge Pressler in her opinion in Winding Hills, supra, 332 N.J. Super. at 85. Although Winding Hills was a first-party case applying the manifestation theory of coverage, the core question of what constitutes manifestation in a progressive, continuous-trigger construction defect setting involves a similar task in identifying the appropriate end date.

The facts in Winding Hills concerned, as here, a multi-unit condominium project with construction defects that emerged over a period of time. In November 1989, the condominium association in that case retained an engineering consultant, Trinity Dynamics ("Trinity"), to evaluate the project's buildings in connection

policy period, regardless of when the act occurred); see also Templo Fuente, supra, 224 N.J. at 200-03.

23

A-5415-15T3

with a review of the sufficiency of its capital reserve funding. Id. at 88. During that initial undertaking, Trinity discovered structural deficiencies within two of the buildings, which it reported to the association. Ibid. The association then retained Trinity in June 1990 to undertake an expert analysis "to determine the extent and cause of the deficiencies." Ibid.

Trinity delivered an extensive report to the association in January 1991. Ibid. That expert report delineated how deficiencies in the project's on-site drainage system had led to structural failures in the buildings' foundations. Ibid. The report theorized that the detected foundation problems could have stemmed from improper backfill, subsurface soil erosion, or underground springs. Ibid. Thereafter, the association hired another engineering company, Becht, to remediate the foundation problem. Id. at 88-89. Becht issued a report to the association in June 1993, reporting further structural distress caused primarily by water infiltration. Id. at 89.

Given this chronology, the trial judge in Winding Hills fixed the date of manifestation for insurance coverage purposes as of January 1991, the month when Trinity's expert report was issued. Id. at 89-90. This court affirmed that determination. Ibid.

As Judge Pressler noted, "[w]hile it might have been arguable that [the association] should have been charged with notice of the

24

loss as early as 1989 when Trinity first reported to it that there were foundation problems, we do not see how there can be any other conclusion, respecting the effect of the 1991 report." Id. at 89-90. She added, "[c]ertainly the later Becht report, which uncovered additional problems, cannot reasonably impugn the extent of [the association's] awareness of the essential difficulties in January 1991." Id. at 90 (emphasis added). Consequently, the panel in Winding Hills held that the issuance of Trinity's expert report in 1991 delineating the "essential" nature of the harm — and not its initial discovery that preceded it in 1989-90 — was the appropriate trigger date to use for coverage analysis. Ibid.

The opinion in Winding Hills did not define "essential," as that term was used within its discussion. We presume the panel contemplated a meaning consistent with standard dictionary definitions for "essential," i.e., "constituting or part of the nature of something," "inherent," or "basic." See Webster's II New College Dictionary 384 (2001 ed.); see also Black's Law Dictionary 663 (10th ed. 2014) (defining "essential" as "relating to or involving the essence or intrinsic nature of something[,]" "[o]f utmost importance[,]" or "basic and necessary").

In the present insurance context involving the "essential" manifestation of an injury, we regard the term to connote the revelation of the inherent nature and scope of that injury. On

one end of the spectrum, manifestation cannot be merely tentative (as Trinity's original observations of structural problems in _Winding Hills_ apparently were). See _Winding Hills_, _supra_, 332 _N.J. Super._ at 88-89. Nor must the manifestation be definitive or comprehensive (as apparently was Becht's later report, after it had remediated the structural harm). _Ibid._ The critical term "essential," as used in this coverage context, should be understood and applied consistent with such concepts.

Here, Air Master likens Jersey Infrared's May 2010 expert report, which delineated the nature and extent of the rooftop moisture damage, to Trinity's expert report in _Winding Hills_. _Ibid._ Air Master urges that the May 2010 report provides an appropriate demarcation of the time of manifestation. By contrast, Selective urges that the point of manifestation happened much earlier in 2008, when residents Schultz and Kassem had noticed and reported water infiltration in their units, prompting remedial investigations.

The sparse record in this case provides an insufficient basis to resolve the manifestation question. Apparently no depositions were taken in this declaratory judgment action of persons who might have knowledge of what information was known at what times about the building's construction defects, and whether that

26

information had emerged or could reasonably have been known before or after Selective's policy period began in June 2009.[8]

We decline to treat the news article containing hearsay statements that some unit owners had observed water problems in their units as early as 2008 as conclusive proof that the progressive injury had sufficiently "manifested" by that time.[9] If such original complaints were analytically dispositive, then Trinity's preliminary discovery in 1989-90 of structural defects in <u>Winding Hills</u> would have been deemed by the court to have established the date of manifestation in that case. Instead, the issuance of Trinity's later January 1991 report delineating the nature and extent of the problems comprised the proper date of manifestation. <u>Winding Hills</u>, <u>supra</u>, 332 <u>N.J. Super.</u> at 88-89.

---

[8] We do note that the appellate record alludes to (but does not contain) two expert reports ("the Desman reports") issued by a different consultant in May and July 2010. Since those reports post-date the May 2010 Jersey Infrared study, and are within Selective's policy period, we need not concern ourselves with their contents at this time, although they may have some relevance on remand depending on what they may say about the chain of events.

[9] We reject Selective's argument that Air Master has "conceded" the accuracy of the unsworn statements made in the news article. Air Master expressly denied the article's accuracy in its summary judgment motion filings. In addition, the unsworn hearsay statements made in the article by unit owners and unidentified "workers" are not presented in a form prescribed by <u>Rule</u> 1:6-6. See <u>Mazur v. Crane's Mill Nursing Home</u>, 441 <u>N.J. Super.</u> 168, 179-80 (App. Div. 2015). <u>See also</u> <u>N.J.R.E.</u> 805 (concerning embedded hearsay statements cited for their truth).

A-5415-15T3

By further comparison, we note that the dates of the patients' initial lung symptoms in Polarome were not dispositive of the trigger end date. Polarome, supra, 404 N.J. Super. at 256-57. Rather, the times of the clinical diagnosis of Kuttner and the biopsy test results of Blaylock were deemed to have been the points of manifestation. Id. at 257.

Here, we cannot tell with any confidence what, if any, other information about the building defects was or reasonably could have been revealed between the time of the unit owners' complaints to the time of the start of Selective's policy in June 2009. This case must be remanded to ascertain that vital information.

The temporal analysis in this case is complicated further because it appears that the water infiltration problems identified on the roof might not have been detected until the May 2010 expert report by Jersey Infrared. The newspaper article cited by Selective does not mention any water damage on the roof. To be sure, it generally would not be surprising that a leaky roof could be responsible for water damage observed on residential floors below. Even so, there appear to be genuine issues of material fact concerning when the water infiltration problems on the roof

first became known, or reasonably could have been known.[10]  See R. 4:46-2.

For these many reasons, we vacate summary judgment in favor of Selective and remand for further proceedings, guided by the legal principles set forth in this opinion.  The trial court shall have discretion to reopen discovery to explore the critical factual issues we have spotlighted, followed by appropriate renewed motion practice or, if warranted to enable witness credibility findings, an evidentiary hearing.  We do not retain jurisdiction.

Vacated and remanded.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

---

[10] This also raises a possible factual question to address on remand as to whether the damage to the roof and its replacement is harm that is "indivisible" from the damage to the rest of the building, or whether, conversely, the deterioration of the roof comprises distinct property damage stemming from entirely distinct construction defects.  The May 2010 expert report issued by Jersey Infrared is notably inconclusive on that point.

A-5415-15T3